A97A0979. CHICAGO INSURANCE COMPANY v. CENTRAL MUTUAL INSURANCE COMPANY.
(494 SE2d 1)

ANDREWS, Chief Judge.

Chicago Insurance Company (Chicago) appeals from the trial court's order granting summary judgment to Central Mutual Insurance Company (Central Mutual) on Central Mutual's claim for reim-

bursement for expenses incurred in defending the DeKalb Board of Realtors (DeKalb Board) in a suit alleging violations of the Sherman Anti-Trust Act and Fair Housing Act. Chicago argues on appeal that the trial court erred in finding it waived compliance with a provision in its policy with the National Association of Realtors (NAR) stating that it would provide coverage to the NAR's member boards, of which the DeKalb Board was one, only if they were in compliance with all of the policies of the NAR. We agree and reverse the judgment of the trial court.

Chicago and Central Mutual both issued insurance policies which covered the DeKalb Board and its wholly owned subsidiary, the Metropolitan Multi-List, Inc. d/b/a Metro Listing Service (MML). Central Mutual issued two policies of insurance to the DeKalb Board and the MML, a Commercial Lines Policy and a Centralized Commercial Excess Liability Policy. Chicago's policy was issued to the NAR, and the DeKalb Board and MML were covered under this policy as additional insureds.

Under the Chicago policy in effect from June 1, 1988 through June 1, 1989, Chicago agreed to defend and to pay claims expenses for any suits alleging anti-trust or fair housing violations. The policy also provided that the duty to pay claims expenses was conditioned upon the additional insureds' compliance with the following provisions:

"Provided always that the coverage provided by this policy shall only apply to those insureds which:

A. Maintain their Governing Documents in full compliance with the:

1. Constitution and Bylaws of the Named Insured;

2. Policies adopted by the Board of Directors of the Named Insured; and

B. Adhere to and follow in their day-to-day activities the:

1. Constitution and Bylaws of the Named Insured;

2. Policies adopted by the Board of Directors of the Named Insured. . . ."

The NAR offered this insurance under the Chicago policy to its member boards as a means of encouraging their compliance with the NAR's constitution, by-laws and policies. The NAR sent out a form letter to each board every year stating that only those boards whose governing documents conformed to the standards and policies of the NAR would be afforded insurance coverage under this policy.

In 1985, the NAR adopted a policy of requiring members to accept exclusive agency listings in their multiple listings service.[1] In

---

[1] An exclusive agency listing is one in which the seller reserves the right to sell the

1987, an NAR review of the DeKalb Board's governing documents showed the DeKalb Board was not in compliance with this exclusive agency listing policy.

Accordingly, on July 7, 1987, Michelle Ribant of the NAR wrote the Executive Vice-President of the DeKalb Board, informing her of the DeKalb Board's noncompliance with the exclusive agency listing policy. Shortly thereafter, when Laurene Janik of the NAR called Carolyn Ebert of the DeKalb Board to discuss this noncompliance, Ms. Ebert stated she was aware of the noncompliance and had brought it to the attention of the Board of Directors. Nevertheless, she said the Board of Directors voted on two occasions not to adopt this policy of the NAR and rejected any proposal to accept exclusive agency listings into the MML.

On December 22, 1988, Fletcher Thompson and the Empire Real Estate Board sued the DeKalb Board and the MML, alleging antitrust and Fair Housing Act violations. *Thompson v. Metropolitan Multi-List,* 934 F2d 1566, 1570 (11th Cir. 1991).[2] The DeKalb Board notified Chicago of the suit, requesting coverage under the "Claims Expense" provision in its policy under which Chicago was obligated to pay $75,000 per claim per association.

Chicago referred the claim to the NAR for a determination as to whether the DeKalb Board and the MML were in compliance with the policies of the NAR. The NAR determined that the DeKalb Board and MML were not in compliance with the policy mandating that member boards accept exclusive agency listings into their multiple listing service. Because the DeKalb Board was not in compliance with this policy, Chicago denied coverage for the *Thompson* suit.[3]

After being denied coverage by Chicago, the DeKalb Board made a claim under its insurance policies with Central Mutual and Central Mutual defended the claim subject to a reservation of rights. Central Mutual incurred attorney fees on behalf of the DeKalb Board and MML in the amount of $94,475 before gaining a ruling in its declaratory judgment action that it had no obligation to provide a defense under the policies issued to the DeKalb Board.

---

property himself and not pay a commission to the listing agent.

[2] This suit arose as a result of a policy of the DeKalb Board restricting the use of its multiple listing service to member realtors. For years, African-Americans were not allowed to become members of the DeKalb Board, and as a result, formed their own real estate boards serving a predominantly African-American clientele. Empire, one of these predominantly African-American associations, claimed that its members could not afford to belong to both organizations and were forced to either give up their membership in Empire or be denied access to the multiple listing service. See *Thompson*, supra at 1569-1570.

[3] It should be noted that a similar suit, *Presley v. Metropolitan Multi-List,* was filed in federal district court against the DeKalb Board and MML on June 15, 1990, for which Chicago did provide coverage. At the time this second suit was filed, the DeKalb Board and MML had changed their policy on accepting exclusive agency listing agreements.

Central Mutual then filed the instant suit, seeking indemnification for expenses incurred on behalf of the DeKalb Board and the MML. Central Mutual alleged Chicago breached an agreement to pay a portion of the attorney fees incurred in defending the *Thompson* suit[4] and also that Chicago breached its contract with its insured and Central Mutual was entitled to sue to enforce this contract as a third party beneficiary.

In ruling on both parties' motions for summary judgment, the trial court found that Central Mutual had a right to enforce the Chicago policy and also that, although the DeKalb Board and MML had violated a condition precedent to coverage under the policy, Chicago, through the NAR, had waived compliance with this condition. This appeal followed.

1. Chicago correctly denied coverage to the DeKalb Board and the MML. It is undisputed that the DeKalb Board and the MML were not in compliance with one of the policies of the NAR, that of accepting exclusive agency listings. It is also undisputed that compliance with all of the policies of the NAR was a condition precedent to being afforded coverage under the Chicago policy.

The trial court found that Chicago had waived coverage through the NAR because when the policy was renewed on June 1, 1988, the NAR knew the DeKalb Board and MML were not in compliance with the exclusive agency listing requirement. The trial court relied on *Boston Ins. Co. v. Barnes*, 120 Ga. App. 585 (171 SE2d 626) (1969), in holding that Chicago should have refused to issue the policy since it knew the DeKalb Board could not comply with a condition precedent to coverage. Further, the trial court stated that, having once issued the policy with this knowledge, Chicago was estopped from denying coverage and was deemed to have waived the condition precedent. The court found that Chicago's claim that it had no knowledge of whether the DeKalb Board was in compliance with the policies of the NAR was meritless, as the NAR was Chicago's agent in this matter and it had knowledge, at the time the policy was issued, that the DeKalb Board was not in compliance with all of its policies.

But, *Barnes* is distinguishable from the instant case. In *Barnes*, we found the insurance company was estopped from relying on a provision in the policy denying coverage if the property had been vacant more than 60 days before the fire. *Barnes*, supra at 592. This holding was based on the following facts: The authorized agent was "(1) aware of the unoccupancy at the time the policy was written in the beginning, and again at the time it was renewed, and knew it was not

---

[4] We do not address this issue because it was not ruled on by the trial court and therefore was not briefed on appeal. Accordingly, there is nothing presented for our review.

going to be occupied as it was being remodeled, (2) the policies remained in his possession and the provisions thereof were outside the knowledge of the insured, (3) he had advised the insured that he was fully covered, and (4) he made the statement in his deposition that the failure to obtain a vacancy permit was his oversight. . . ." Id. Here, the facts are distinguishable in that the NAR notified the DeKalb Board that it was not in compliance with all of its policies and the DeKalb Board was aware that they must bring their procedures into compliance or be denied coverage.

The instant case is similar to a case distinguished by *Barnes*, *Fire &c. Ins. Co. v. Fields*, 212 Ga. 814 (96 SE2d 502) (1957). In *Fields*, the policy in question also contained a condition restricting coverage if the building was vacant more than 60 days. Likewise, the agent knew the premises were vacant at the time of renewal and also knew when the premium was paid that the premises had been vacant for more than 60 days. The agent also told the insureds they were covered and "not to worry about it." Id. at 815. But, unlike *Barnes*, the facts did not show the agent had possession of the policy when he made these representations to the insured and the insureds were aware of the vacancy condition in the policy. Therefore, "the insureds were bound to know the rights of the insurer." *Fields*, supra at 815. The court found "the knowledge of the agent as to vacancy of the premises, and his oral representations to the insureds that they were covered, did not estop the insurer from asserting a breach of the condition in the policy as to occupancy of the premises, nor would the receipt of the premiums by its agent with knowledge that the premises had been vacant for more than sixty consecutive days, and the retention of such premiums by the insurer, estop it from asserting its defense that the provision of the policy had not been waived in writing by it." *Fields*, supra at 815.

Accordingly, even assuming for the purpose of argument that Central Mutual can show the NAR was acting as Chicago's agent, the instant case falls within the facts as set out in *Fields*, supra. It is undisputed that the member boards were informed that compliance with NAR policies was a condition precedent to coverage under the policy issued by Chicago and it is also undisputed that the DeKalb Board knew of the NAR's policy requiring the acceptance of exclusive agency listing agreements but chose not to comply with it, at least up until the time the *Thompson* suit was filed. Thus, as the court stated in *Fields*, the insured in this case was "bound to know the rights of the insurer." *Fields*, supra at 815.

Therefore, we find that Chicago did not, by issuing the policy and accepting payment of the premium, waive the condition precedent requiring the DeKalb Board to be in compliance with the policies of the NAR. The trial court erred in granting Central Mutual's motion

for summary judgment on this issue.

2. In light of our holding in Division 1, we need not address the remaining enumeration of error.

*Judgment reversed. Eldridge, J., and Senior Appellate Judge Harold R. Banke concur.*

### ON MOTION FOR RECONSIDERATION.

Central Mutual filed a Motion for Reconsideration contending that *Fields*, relied upon by this Court in the holding above, has been disregarded in later Supreme Court decisions such as *Christian v. Allstate Ins. Co.*, 239 Ga. 850 (239 SE2d 328) (1977) and *Ga. Farm Bureau Mut. Ins. Co. v. Wall*, 242 Ga. 176 (249 SE2d 588) (1978). These cases are not on point.

In *Wall*, the facts showed the insured was *unaware* that the endorsement did not provide coverage for ice and snow damage because he did not read the endorsement. The insured relied instead on the insurance agent's representations that the endorsement did provide coverage for snow and ice damage. *Wall*, supra at 178. The court's holding turned on whether the failure to discover a conflict in the terms of an oral contract as to what a policy is to contain and what it actually did contain was a jury issue. Accordingly, *Wall* is not applicable in this case.

In *Christian*, the insured, a family-owned corporation, informed the agent that some of the automobiles to be insured were titled in the name of individual family members and were sometimes driven for personal use. In spite of this, the insurance agent prepared a policy identifying the vehicles to be insured as owned automobiles of the company and providing that non-company owned automobiles would be provided coverage only when being driven on company business. The court does not state whether or not the insured was aware of the non-coverage; however, it held that, if the insurance company, with knowledge that some of the automobiles were non-company owned and also were driven for personal use, still collects premiums on each of these automobiles with this knowledge, then it is estopped from denying coverage on a vehicle as a non-owned vehicle. *Christian*, supra at 852-853. Again, that is not the case here. There is no insurance agent writing a policy and ignoring the requests of the insured.

In our original opinion we did not discuss the question of agency as ruled on by the trial court. However, in the interest of clarity, we now decide it and find that the NAR, as the named insured who paid the premium, cannot also be the agent of the insurance company. While it is clear that Chicago relied on the NAR to furnish information as to whether coverage would be denied additional insureds for failure to follow NAR policies, this was a condition precedent to cov-

erage and one which only the NAR could determine. Accordingly, the NAR was required to furnish this information. Further, this was a determination that could be made only at the time of the loss because it was possible for member boards to come in and out of compliance with NAR procedures each time these boards voted to change their by-laws.

The purpose behind the application of the principles of waiver or estoppel against an insurance company is to prevent the insurer from accepting payment for coverage which it knows it will deny. *Brown v. Globe &c. Fire Ins. Co.*, 161 Ga. 849, 853 (133 SE 260) (1926). The NAR cannot be, simultaneously, an agent of the company accepting payment for a policy it does not intend to honor and the named insured paying for that same policy.[5]

*Motion for reconsideration denied.*

DECIDED OCTOBER 2, 1997 —
RECONSIDERATION DENIED NOVEMBER 12, 1997.

*Gorby & Reeves, Michael J. Gorby, Blakely H. Frye*, for appellant.
*Long, Weinberg, Ansley & Wheeler, John C. Bonnie, J. Kenneth Moorman*, for appellee.

---

[5] Although the DeKalb Board purchased optional, additional insurance under an endorsement to the policy, the original policy was procured and paid for by the NAR.