**CAROLINA INDUSTRIAL PRODUCTS, INC., Joseph Wilen, and J.W. Equities, L.L.C., Plaintiffs,**

**v.**

**LEARJET, INC., Raytheon Aircraft Services, Inc., and National Union Fire Insurance Co., Defendants.**

No. 00–2366–JWL.

United States District Court, D. Kansas.

Dec. 18, 2001.

Edward A. McConwell, Catherine Moore, McConwell Law Offices, Mission, KS, for Plaintiffs.

Mark D. Katz, John M. Lilla, Sherman, Taff & Bangert, P.C., Kansas City, KS, Ron A. Sprague, Gendry & Sprague, P.C., San Antonio, TX, Jeff C. Spahn, Jr., Michael G. Jones, Martin, Pringle, Oliver, Wallace & Spikes, L.L.P., Wichita, KS, John W. Cowden, Mary C. O'Connell, Baker, Sterchi, Cowden & Rice, L.L.C., Kansas City, MO, Bradley Brown, Martin, Pringle, Oliver, Wallace & Spikes, L.L.P., Wichita, KS, for Defendants.

## MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

Before the court are defendant Learjet Inc.'s ("Learjet") summary judgment motion (Doc. 80), Learjet's supplemental motion for summary judgment (Doc. 166),[1]

---

1. Learjet filed this second summary judgment motion within the time allowed for the filing of dispositive motions. The plaintiffs' response to the motion consisted of two pages and asserts that the supplemental motion only raises one new issue, addresses this argument with one sentence, and incorporates by reference its response to Learjet's first summary judgment motion. The supplemental motion, in fact, raises a host of new arguments that are not addressed by the plaintiffs' response. Some of these arguments were addressed by the plaintiffs at oral argument held on these motions on December 4, 2001. The court will not assume that the new arguments are con-

defendant Raytheon Aircraft Services, Inc.'s ("Raytheon") summary judgment motion (Doc. 172), defendant National Union Fire Insurance of Pittsburgh's ("National Union") motion for summary judgment (Doc. 164) and Carolina Industrial Products' ("Carolina Products") motion for partial summary judgment (Doc. 169). The motions are granted in part and denied in part as follows: summary judgment is granted to Learjet with respect to Counts One through Seven; summary judgment is granted to Raytheon with respect to Counts Ten and Twelve; summary judgment is granted to Raytheon in part with respect to Counts Eleven and Thirteen in that the plaintiffs may only recover damages for the repair of damages to N825D caused by the February 2000 landing accident; summary judgment is granted to National Union, in part, with respect to Counts Fourteen and Fifteen in that the court finds that National Union did not breach the insurance contract by not paying under the "total loss" provision of the policy; summary judgment is granted to National Union with respect to Count Fifteen; and the plaintiffs' partial summary judgment motion is denied.

## 1. Statement of facts

Carolina Products, J.W. Equities, L.L.C. ("J.W.Equities") and Joseph Wilen filed this action against defendants Learjet, Raytheon and National Union. The lawsuit is the outgrowth of a dispute between the parties concerning repairs to an aircraft owned by Carolina Products and operated by J.W. Equities.[2] The following facts are uncontroverted:

Learjet manufactured airplane model 25D, serial number 212 ("25D–212") in 1976 and model 25D, serial number 263 ("25D–263") in 1979. 25D–212 was damaged in a crash in 1985 and 25D–263 was damaged in a tornado in 1991. 25D–263 was determined to be a "total loss" by the insurer of the aircraft and was removed from Learjet's list of active aircraft. Maruice Houvis purchased 25D–263 and the fuselage of 25D–212 and rebuilt or repaired 25D–263 with some or all of the components of the fuselage of 25D–212. Mr. Houvis hired a Federal Aviation Administration ("FAA") Designated Engineer Representative ("DER"), Harold Kosola, to confirm that the replacement of the fuselage complied with FAA regulations. Mr. Kosola issued a report concluding that "[t]he replacement of the damaged fuselage of Lear model 25D, S/N 263 by using an Airworthy Fuselage from Lear model 25D, S/N 212 is structurally acceptable" and an FAA Form 8110–3 indicating that the fuselage replacement was in compliance with FAA regulations. In May 1994, Carolina Products purchased the airplane, registered as N825D and bearing the serial number 263. When Carolina Products purchased the plane, Joseph Wilen and other representatives of Carolina Products knew that the fuselage had been replaced.

Before purchasing the plane, Carolina Products hired Raytheon to complete work on N825D, which the plaintiffs allege in the pretrial order "included complete review and determination of the adequacy of all log book entries and the compliance with all airworthiness directives and service bulletins applicable to the aircraft." The plaintiffs allege that Raytheon breached its agreement with the plaintiffs by failing to warn the plaintiffs that the Learjet Service Bulletin 23/24/25–340, recommending replacement of the landing gear hydraulic solenoid valve, had not been followed. Raytheon disputes the plaintiffs' characterization of the work that was to be performed and argues that Raytheon was not obligated to determine whether the

ceded but will evaluate the merits of each argument.

**2.** Joseph Wilen owns both Carolina Products and J.W. Equities.

aircraft was in compliance with all service bulletins.

After Carolina Products purchased N825D, Raytheon performed, on several occasions, work related to the maintenance of the airplane. In 1994, Raytheon performed six and twelve-month inspections of N825D. The plaintiffs assert that these inspections required compliance with Learjet recommended service bulletins and that Raytheon did not identify that N825D was not in compliance with Learjet Service Bulletin 23/24/25–340, recommending replacement of the hydraulic solenoid valve. Raytheon also completed maintenance in 1997 that, according to the plaintiffs, required identification of all outstanding service bulletins.

In March of 1999, the plaintiffs requested that Raytheon perform a 600–hour inspection of N825D. The Raytheon maintenance proposal provided for the completion of a "300/600/1200 hour inspection." According to the plaintiffs, Raytheon breached the agreement by "failing to identify and comply with Service Bulletin 23/24/25–340; and by failing to inspect, test and/or replace valve 48C48603 with valve 48C48641." The work-order authorization for the maintenance included "Terms and Conditions" limiting Raytheon's liability to "repair and replacements" for "failure to perform Labor in accordance with Standards" and requires that an action for breach of warranty be brought within one year. The plaintiffs point out that the work-order was signed by a Raytheon employee, not Joseph Wilen, allege that it was signed "without the knowledge or consent of Joe Wilen," and argue that the limits on liability, therefore, are not enforceable.

In February of 2000, N825D was damaged in a landing accident. The plaintiffs allege that the accident would not have occurred if N825D was in compliance with Service Bulletin 23/24/25–340.

After the accident, Raytheon was asked to remove N825D from the runway and evaluate the airplane for needed repairs. On March 13, 2000, by means of a written document entitled "Authorization," Joseph Wilen authorized Raytheon and Hale Aircraft Engines to repair N825D. Mark Smith, a Raytheon employee, testified at his deposition that before Joseph Wilen signed the authorization, Mr. Smith told Mr. Wilen that the repairs could not be completed without support from Learjet. The fax cover sheet sending the authorization to Mr. Wilen indicates that the time needed for repairs to N825D will "be dependent on support from Learjet." Mr. Wilen testified in his deposition that he told Mr. Smith not to begin repairs to N825D unless they could be completed. On March 28, 2000, by a letter to Raytheon, Mr. Wilen rescinded his authorization to proceed with the repairs to N825D.

On May 1, 2000, Raytheon faxed to Mr. Wilen a proposal for the repair of N825D. The proposal included repair of the "outboard leading edge" and a stall test following repair to the leading edge. The proposal noted that completion of the stall test "will be dependent upon the cooperation of Bombardier/Learjet." The proposal was accepted. On June 23, 2000, Mr. Smith sent to Mr. Wilen a proposal, listing items that "are in addition to, or a revision of" the earlier proposal. The proposal noted that all repairs to the leading edge must be performed by Learjet and included a corresponding charge of $2,500 for "outside service." Mr. Wilen accepted the June 23, 2000 proposal.

The Learjet structural repair manual requires that repairs to the leading edge be performed by an authorized Learjet repair facility. Raytheon contacted Learjet about repairing the leading edge. Learjet responded by informing Raytheon that 25D–236 had been "attrited" in May of

1991 and sold for scrap and that Learjet would not "provide Engineering or Technical support for this aircraft." Raytheon completed all of the repairs to N825D except for the leading edge and stall test by mid-August 2000.[3]

The FAA initiated an investigation of the accident that included reviewing all of the maintenance records and logbook entries for N825D. At the conclusion of the investigation, the FAA stated that it "was unable to determine whether Lear 25D–263, in its present configuration, conformed to its original type design or any approved type design, and that it was in an airworthy condition." For this reason, on October 19, 2000, the FAA issued an order suspending the airworthiness certificate of N825D. By means of a settlement agreement signed April 3, 2001, the FAA dismissed its action against N825D. The settlement agreement provided that, upon the completion of a series of actions listed in the agreement, "the proposed action to suspend the airworthiness certificate of civil aircraft N825D is no longer necessary" and that the FAA agrees to issue an Airworthiness Certificate for N825D with a provision limiting the aircraft to flying at 45,000 feet.

The plaintiffs allege that, in performing the log book research in 1994, Raytheon breached its duty "to properly evaluate the books and records of N825D in May, 1994 to assure that all records met the requirements of its Flight Standards District Of-fice" and to advise the plaintiffs "that the FAA Atlanta FSDO might question September, 1992 log book entries concerning repair of N825D."

National Union insurance policy GM3388558–01, effective on the date of the landing incident, provided coverage for "physical damage" to N825D. According to the policy, "physical damage" includes "accidental, direct physical loss of or damage to scheduled aircraft ... but does not include the loss of use or any residual depreciation in value either before or after any repairs have been made." The policy excludes from the definition of "physical damage" any "loss damage, claim or expenses ... which is due and confined to wear and tear, deterioration, mechanical or electrical breakdown of the insured property, its equipment, components or accessories." The policy provides that in the event of a "total loss," National Union will pay to the insured the value of the aircraft. "Total loss" is defined as "any physical damage loss for which the cost to repair when added to the salvage value equals or exceeds" the insured value of the aircraft. The insured value of N825D is $1,000,000. The salvage value of N825D, calculated near August 2001, according to an expert retained by Joseph Wilen, was approximately $461,000. National Union has made approximately $148,000 in payments for Raytheon's repairs to the aircraft but refused to pay $9,900 for engine repairs or $6,000 in storage costs.[4] The plaintiffs

---

**3.** The plaintiffs respond to this statement of fact by Raytheon with the mere assertion that the statement is "disputed." D. Kan. Rule 56.1 requires that the plaintiffs cite to evidence in the record controverting the statement of fact. Because the plaintiffs did not point to any such evidence, Raytheon's statement of fact shall be taken as true for the purpose of deciding its summary judgment motion. The court also notes that in its response to National Union's summary judgment motion, the plaintiffs admit that the only

repair that remains to be completed on N825D is to the leading edge of the right wing.

**4.** In the plaintiffs' response to Raytheon's summary judgment motion, the plaintiffs alleged that the engine repairs, completed by Hale Aircraft, were authorized by Mark Smith, a Raytheon employee, without the consent or approval of the plaintiffs. The pretrial order does not, however, allege that this con-

claim that failure to pay these two costs amount to a breach of the insurance contract. The plaintiffs also claim that National Union should have "totaled" the aircraft and paid the insured value of the aircraft and allege that the failure to do so constituted "bad faith" under Georgia law.

### 2. Summary judgment standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, the movant may simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

### 3. Tortious interference with contract

Count One, as set forth in the pretrial order, alleges that Learjet tortiously interfered with the plaintiffs' contract with Raytheon for the repair of N825D following the February 2000 accident. The plaintiffs allege that "Learjet was made aware of the fact that [Raytheon] was contracted [sic] to perform the repairs" but refused to provide the support necessary for Raytheon to complete the repairs. In the pretrial order, the plaintiffs allege that Learjet tortiously interfered with the contract by falsely representing to the FAA that the fuselage installed in N825D "was an unsuitable part," providing false and misleading information to the FAA about the airworthiness of N825D, failing to provide technical support to Raytheon, preventing Raytheon from repairing the leading edge, preventing Raytheon from completing the flight tests necessary to return N825D to service, and causing the FAA to place a condition notice on N825D and initiate an enforcement action to suspend the airworthiness certificate of N825D.

As explained above, Learjet filed two summary judgment motions. The court denies summary judgment based on the arguments advanced in the initial motion but grants summary judgment to Learjet

---

duct was actionable and does not seek to recover the cost from Raytheon.

based on the arguments made in the supplemental motion.

■ In its initial motion, Learjet argues that it is entitled to a qualified privilege regarding statements made about N825D.[5] Learjet points out that Georgia law creates a statutory privilege for statements made in good faith in the performance of a legal or moral private duty and for statements made with a good faith intent to protect the interest of the speaker in a matter in which it is concerned. O.C.G.A. § 51–5–7. "The absence of a good faith belief in the truth of a slanderous statement prevents a qualified privilege ... the failure to exercise ordinary care to reasonably ascertain the truth or accuracy of the statement may show a lack of good faith when the facts and circumstances require such exercise." *Smith v. Vencare, Inc.,* 238 Ga.App. 621, 519 S.E.2d 735, 741 (1999). The court need not reach the issue of whether the relevant statements fall within the scope of such a privilege because whether the statements were made in "good faith" is controverted.

■ The plaintiffs point to evidence showing that Learjet engineers advised Mr. Houvis that there were no significant structural differences between the fuselages of 25D–212 and 25D–263. On the basis of this information, Harold Kosola determined that the two fuselage assemblies were interchangeable and issued FAA Form 8110–3 approving the use of the 25D–212 fuselage in the repair of 25D–263. The plaintiffs also point to evidence showing Lee Ramsey, representing the plaintiffs, provided Learjet a copy of Mr. Kosola's Form 8110–3. This evidence would be a sufficient basis for a reasonable jury to conclude that Learjet was not acting in good faith when a Learjet employee later told Raytheon that the airplane was "attrited" in May 1991 and sold for scrap and that the airplane did not conform to the Type Certificate Sheet for Learjet Model 25D, serial number 263. Because the privilege turns on the intent of the speaker, whether the privilege applies would be a question of fact. *Watkins v. Laser/Print Atlanta, Inc.,* 183 Ga.App. 172, 358 S.E.2d 477, 479 (1987) ("Even assuming, arguendo, that the statement was so privileged, this privilege is conditional rather than absolute, and it remains for a jury to determine whether the intention was such as to make the defense complete."). The court, therefore, will not grant summary judgment on the basis of Learjet's claim of privilege.

■ In its supplemental motion, Learjet argues that there is an absence of evidence indicating that Learjet caused a breach of contract between Raytheon and the plaintiffs, and an absence of evidence showing that Learjet knew that the plaintiffs had a contract with Raytheon for repair of N825D. Learjet also argues that Raytheon could not contract to replace the leading edge because it was prohibited to do so by the Learjet Repair Manual, making any such contract an unenforceable contract "to perform an illegal act." [6]

**5.** Learjet bases its argument on both Kansas and Georgia law because it "is unclear from Plaintiff's Amended Complaint whether Plaintiff believes Kansas or Georgia substantive law is applicable under the prevailing choice of law rules." The parties, however, agree in the pretrial order, which was entered subsequent to Learjet's first motion, that Georgia law applies.

**6.** The plaintiffs make only one argument in their written response to Learjet's supplemental motion. The plaintiffs argue that Learjet's statement that Raytheon could not legally repair the leading edge "presumes that the FAA has approved the Learjet requirement, a fact which Learjet widely publicizes but one for which they have failed to provide evidence of actual FAA mandate or approval." The plaintiffs' response undercuts the foundation for Count One. If Raytheon could replace the leading edge of N825D without the assistance of Learjet or a Learjet-authorized repair facil-

The plaintiffs allege that Learjet's refusal to support Raytheon's efforts to repair the leading edge and perform a stall test caused Raytheon to breach its contract with the plaintiffs. The Learjet Structural Repair Manual requires a new leading edge "be installed at an authorized Learjet repair facility." Raytheon is not such a facility. Following the installation of a new leading edge, a stall flight test must be performed and, according to the Learjet Maintenance and Repair Manual, the test must be performed by a Learjet-approved pilot.

Learjet admits that it refused to aid Raytheon but suggests that other Learjet-authorized repair facilities could have replaced the leading edge. At oral argument, counsel for the plaintiffs maintained that Learjet's support was necessary.[7] In support of the proposition that only Learjet could repair the leading edge, counsel pointed to the revised Raytheon proposal for repair of N825D, the deposition of Mark Smith, a Raytheon employee, and letters authored by Mr. Smith. The June 23, 2000 revision to the proposal to repair N825D notes that "the Learjet 20 series Structural Repair Manual stipulates that no field repair to the leading edge is allowed. All repairs must be performed by Learjet." The manual, which is part of the record, specifies that a new leading edge must be installed "at an authorized Learjet repair facility." In his deposition, Mr. Smith acknowledges that the Learjet repair manual requires that repair to the leading edge be done by a Learjet-authorized repair facility and that Raytheon is

not such a facility. Mr. Smith was asked in his deposition whether he considered requesting a Learjet-authorized repair facility to repair the leading edge after Learjet refused to assist Raytheon. In response, Mr. Smith said "no" and explained that he "likes to work with the original equipment manufacturer because [he] know[s] that the work is going to be done right." *See* 8/23/01 Smith deposition at 144–45. Mr. Smith then acknowledged that Raytheon, at the time of the deposition, was willing to allow a Learjet-authorized repair facility to make the repairs to N825D in place of Learjet. *Id.* The letters mentioned by counsel at oral argument do not address the subject of whether facilities other than Learjet can repair the leading edge.

The record contains a proposal from Garrett Aviation, a Learjet-authorized repair facility for the repair of the leading edge on N825D, dated September 21, 2001. The proposal does not indicate that Garrett Aviation could not have repaired the leading edge at an earlier date. The record also contains an excerpt of a deposition of a Learjet representative in which the representative states that Learjet's position is that the leading edge should be repaired or replaced by a Learjet-authorized facility, even if the facility is not owned by Bombardier or Learjet.[8]

At oral argument, counsel for the plaintiffs alleged that Learjet-authorized repair facilities are not able to repair N825D without the approval of Learjet. The record, however, contains no such evidence.

---

ity, then the failure of Learjet to assist Raytheon would not cause Raytheon to breach its contract with the plaintiffs.

7. In their written response to Learjet's supplemental motion, the plaintiffs do not address the absence of evidence showing that Learjet's actions caused Raytheon to breach the contract.

8. The deposition excerpt was submitted by Raytheon, Exhibit 39, and does not identify the Learjet representative. Plaintiffs have not objected, for any evidence law reason, to this statement being considered by the court.

Counsel also alleged that Garrett Aviation and other Learjet-authorized repair facilities would not repair the leading edge without Learjet's agreement to provide Learjet-approved pilots to perform a stall test and that Learjet only recently agreed to provide that support. Again, the record contains no evidence to support this assertion.

Learjet met its summary judgment burden by pointing out to the court a lack of evidence supporting an essential element of the plaintiffs' tortious interference claim, that Learjet induced a breach of contractual obligations. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998); *Metzler v. Rowell*, 248 Ga.App. 596, 547 S.E.2d 311, 320 (2001) ("Tortious interference with contractual, business, or potential business relations occurs when (1) there is improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the tortious conduct proximately caused damage to the plaintiff."). The burden thereby shifted to the plaintiffs to set forth specific facts that would be admissible in evidence in the event of trial and from which a rational trier of fact could find for the plaintiffs. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adler*, 144 F.3d at 670.

The court concludes that the plaintiffs did not meet their burden to set out evidence from which a reasonable jury could find that Learjet caused Raytheon to breach its contractual obligations. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (explaining that to meet its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial" and that an issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way"); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *ARE Sikeston Limited Partnership v. Weslock National, Inc.*, 120 F.3d 820, 832 (8th Cir. 1997) (holding that summary judgment is appropriate on tortious interference claim where the plaintiff fails to come forward with evidence of causation sufficient to create a genuine issue for trial.). The only evidence in the record suggesting that only Learjet could repair the leading edge of N825D is the statement in the June 23, 2000 proposal by Raytheon. According to Mr. Smith, the amended June 23 proposal was issued when he realized that the Learjet repair manual required that the work be done by a Learjet-authorized repair facility. *See* 8/23/01 Mark Smith deposition at 67. The manual, which is cited in the proposal as the basis of the requirement, requires that a new leading edge be installed "at an authorized Learjet repair facility." The language in the proposal explaining that "Learjet" must make the repairs, does not, in the opinion of the court, amount to evidence sufficient for a reasonable jury to conclude that other Learjet-authorized facilities could not make the repairs. The language may be explained by Mark Smith's deposition testimony that Raytheon did not consider using a Learjet-authorized repair facility other than Learjet to make the repairs because Raytheon prefers to deal with the original equipment manufacturer. It is also plausible that the statement that only "Learjet"

could repair the leading edge was simply shorthand for "an authorized Learjet repair facility" or that the drafter of the proposal simply misread the manual's requirement. The proposal specifies that the requirement is based on the manual and the manual allows any Learjet-authorized repair facility to install a new leading edge. All other evidence in the record indicates that there are Learjet-authorized repair facilities other than Learjet that could have repaired the leading edge. The attempt by counsel for the plaintiffs to explain away this evidence fails because there is no evidence in the record to support his assertions. For these reasons, the court concludes that no reasonable jury could find that only Learjet could repair the leading edge.

Because facilities other than Learjet could have repaired the leading edge, the mere refusal of Learjet to repair the leading edge of N825D or otherwise support the repairs does not amount to tortious interference with the plaintiffs' contract. *See, e.g., West Virginia Glass Specialty Co. v. Guice & Walshe Inc.,* 170 Ga.App. 556, 317 S.E.2d 592, 594 (1984) (holding that the refusal of one business opportunity in favor of another does not amount to tortious interference); *Lively v. McDaniel,* 240 Ga.App. 132, 522 S.E.2d 711, 714 (1999) (holding that summary judgment on claim of tortious interference is appropriate where there is an absence of evidence on the essential element of inducement). Raytheon could have contracted for repair of the leading edge with another Learjet-authorized repair facility. Learjet's refusal to make the repairs, thus, did not cause Raytheon to fail to complete the repairs to N825D, allegedly in breach of the plaintiffs' contract with Raytheon.[9]

With respect to the stall test, the evidence submitted to the court does not indicate that Learjet refused to perform a stall test and that only Learjet could perform a stall test. As pointed out by Learjet, there is simply an absence of evidence on the subject. Learjet met its initial summary judgment burden by pointing out the lack of evidence showing that Learjet's actions caused a breach of contract. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden, thereby, shifted to the plaintiffs to point to evidence showing that there is a genuine issue of fact for trial. The plaintiffs have failed to point the court to evidence showing that Learjet's assistance was required for the performance of a stall test and that Learjet refused to perform the stall test if N825D was repaired by a Learjet-authorized repair facility. In its own review of the record, the only evidence the court found regarding whether Learjet would support a stall test comes from the deposition of Mark Smith. When Mr. Smith was asked if Learjet refused to provide assistance with flight tests needed to return N825D to service, he replied: "Well, we never came to that. But I could only assume that they wouldn't support me for that effort." *See* 2/7/01 Mark Smith deposition at 50–51. In failing to point the court to evidence indicating the Learjet refused to perform a stall test if N825D was repaired by a Learjet-approved repair facility and that only Learjet could perform a stall test, the plaintiffs have failed to meet their burden to show that there is a genuine issue for trial. Summary judgment, therefore, is appropriate.

---

9. The court notes that additional evidence, such as evidence showing the existence of a monopoly, could change this conclusion. As explained in the discussion of Count Five, however, the plaintiffs failed to point to evidence showing that Learjet holds a monopoly over the repair of Learjet planes. Instead, the evidence in the record indicates that facilities that are not owned by Learjet could have repaired the leading edge.

To the extent that Count One is based on the allegations that Learjet failed to provide technical support to Raytheon, prevented Raytheon from repairing the leading edge, and prevented Raytheon from completing the flight tests necessary to return N825D to service, summary judgment is granted to Learjet. As Learjet points out, there is an absence of evidence to support these contentions and the plaintiffs have failed to point the court to evidence that would create a genuine question of fact for trial.

■ To the extent that Count One is based on the allegations that Learjet falsely represented to the FAA that the fuselage installed in N825D "was an unsuitable part," provided false and misleading information to the FAA about the airworthiness of N825D, and caused the FAA to place a condition notice on N825D and initiate an enforcement action to suspend the airworthiness certificate of N825D, summary judgment is also granted. The record is devoid of evidence indicating that statements made by Learjet that 25D–263 was "attrited" in May of 1991 and sold for "scrap" and that N825D did not comply with the type certificate for 25D–263 caused Raytheon not to repair the leading edge or perform a stall test.[10]

The evidence does not indicate that the FAA enforcement action or the FAA's receipt of Learjet's opinion about the airworthiness of N825D caused Raytheon to be unable to complete repairs to N825D. Instead, the evidence indicates that Raytheon did not go forward with the repairs because Learjet refused to support repairs to the leading edge and Raytheon did not seek support from any Learjet-authorized repair facility. *See* 8/23/01 Mark Smith deposition at 133–34 (explaining that Learjet's refusal to repair the leading edge stopped Raytheon from going forward with the repairs). Learjet met its initial summary judgment burden by pointing out the lack of evidence showing that Learjet's statements caused a breach of contract and the plaintiffs failed to meet their subsequent burden to point to evidence showing that there is a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment, therefore, is granted to Learjet to the extent that Count One is based on these allegations. No other allegations in support of Count One exist in the pretrial order and, thus, summary judgment is granted to Learjet as to the entirety of Count One.[11]

### 4. Tortious interference with business expectancy

■ Count Two, as set forth in the pretrial order, is based on the allegations that the plaintiffs had a business relationship with Raytheon "on February 25, 2000, and thereafter with the probability that the damage to Learjet N825D would be

---

**10.** The evidence also does not indicate that Learjet's statement caused the FAA to suspend the airworthiness certificate. In the suspension order the FAA states as the basis for the suspension that "[t]he records that were required to be kept by the owner of the aircraft (pursuant to FAR 91.417), that would establish that the fuselage and empennage installed on Lear 25D–263 were in fact serviceable, airworthy parts were not available from the aircraft's owner."

**11.** Because the court grants summary judgment based on the absence of evidence indicating that Learjet caused Raytheon to breach its contract with the plaintiffs, the court need not reach Learjet's additional arguments that there is an absence of evidence showing that Learjet knew that the plaintiffs had a contract with Raytheon for repair of N825D, and that Raytheon could not contract to replace the leading edge because it was prohibited from doing so by the Learjet Repair Manual, making any such contract an unenforceable contract "to perform an illegal act."

promptly repaired" and that Learjet "induced a third party or parties not to enter into or continue business relationships concerning the repair of N825D." [12]

In its initial summary judgment motion, Learjet argues that it is entitled to a qualified privilege regarding statements made about N825D. Summary judgment on that basis is denied for the same reasons that it is denied as to Count One. Learjet also argues, in its supplemental summary judgment motion, that there is no evidence that Learjet "induced Raytheon not to enter into or continue a relationship concerning repairs to N825D" or that Learjet made false representations to the FAA or that it caused the FAA to take any actions.

■ To the extent that Count Two is based on the allegation that Learjet's refusal to support repairs to the leading edge or perform a stall test caused Raytheon not to repair N825D, summary judgment is granted to Learjet because, as explained with respect to Count One, the plaintiffs failed to point to evidence creating a genuine issue for trial. To the extent that Count Two is based on the allegation that Learjet's statements caused the FAA to initiate proceedings to suspend the airworthiness certificate of N825D, summary judgment is also granted because, as explained with respect to Count One, the plaintiffs failed to point to evidence indicating that statements made by Learjet to the FAA or FAA actions caused Raytheon not to repair the leading edge or perform a stall test.[13]

5. Deceptive trade practices

■ In Count Three, the plaintiffs allege that Learjet engaged in deceptive trade practices by engaging "in a continuous pattern of false and misleading statements, including, but not limited to, Lear's statement that N825D has been 'attrited' and sold for scrap and that it fails to meet

---

12. In the pretrial order, Learjet argues that Kansas law applies to Count Two, noting that the plaintiffs have failed to identify "what specific actions by Learjet are the basis for" Count Two and that any information provided by Learjet to the FAA or others would have been in response to inquiries directed to Learjet in Kansas. The plaintiffs maintain that Georgia law applies. A federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Kansas Supreme Court has held that the law of the state where the tort occurs controls. *Ling v. Jan's Liquors*, 237 Kan. 629, 635, 703 P.2d 731 (1985). Under this rule, the tort is deemed to have occurred where the wrong was felt. *Id.* In the case of alleged financial harm, as is the case with Count One, the court looks to the state in which the plaintiff felt the financial harm. *Bushnell Corp. v. ITT Corp.*, 973 F.Supp. 1276, 1286 (D.Kan.1997); *Altrutech, Inc. v. Hooper Holmes, Inc.*, 6 F.Supp.2d 1269, 1276 (D.Kan.1998). The pretrial order indicates that J.W. Equities is a Georgia limited liability company and that Joseph Wilen is a resident of Georgia. Carolina Products is incorporated in North Carolina but its sole owner resides in Georgia and its only identified business is owning N825D. The court presumes that the principal place of business of Carolina Products, and the state in which financial harm would be felt, is Georgia. In such a situation, the law of Georgia is applicable because the financial harm alleged would be felt in Georgia. The fact that the FAA inquiries of Learjet were made in Kansas has no bearing on which state's law is applicable.

13. The pretrial order specifies that, for the plaintiffs to prevail on Count Two, they must prove that Learjet induced a third party not to enter into or continue a business relationship concerning the repair of N825D. The order does not include causing the FAA to suspend the airworthiness certificate of N825D as a basis for prevailing on Count Two. This is an independent basis for granting summary judgment to the extent that the pretrial order is based on the allegation that Learjet caused the FAA to suspend the airworthiness certificate.

the requirement of Type Data Certificate A10–CE." Learjet argues in its summary judgment motion that its statements are privileged under Georgia law. Summary judgment on this basis is denied for the same reasons that the court denies summary judgment on that basis as to Count One.

In its supplemental motion for summary judgment, Learjet argues that the plaintiffs' allegations in Count Three do not state a claim under the Georgia Deceptive Trade Practices Act. Learjet argues that the act does not apply to "non-commercial property or mere business assets like N825D." The plaintiffs do not respond either in their written response or at oral argument.[14]

■ In general, the act prohibits "deceptive trade practices" defined as causing confusion or misunderstanding about goods or services, or disparaging the goods, services, or business of another. O.C.G.A. § 10–1–372(a). Injunctive relief is the sole remedy for a violation of the act. O.C.G.A. § 10–1–373(a); *Lauria v. Ford Motor Co.*, 169 Ga.App. 203, 312 S.E.2d 190, 193 (1983). To be entitled to injunctive relief, a plaintiff must be "[a] person likely to be damaged by a deceptive trade practice of another." *Lauria*, 312 S.E.2d at 193.

The court grants summary judgment to Learjet on Count Three because it is persuaded that the statute does not apply to the disparagement of property that is neither goods sold nor services rendered by the plaintiffs. The plain language of the statute indicates that the statute applies only to cases involving misrepresentations about goods or services or creating confusion related to the same. Georgia case law applying the statute is similarly limited to such cases.

The Uniform Deceptive Trade Practices Act ("Uniform Act"), enacted by Georgia in 1968 and codified at O.C.G.A. § 10–1–370 to 375, explains in the prefatory note that the law was drafted to create uniformity among state law prohibiting "unfair competition." The note defines such unfair competition as "[d]eceptive conduct constituting unreasonable interference with another's promotion and conduct of business" and explains that the law evolved from "the common law action for trademark infringement." According to the note, the "practices singled out by the Uniform Act can be roughly subdivided into conduct involving either misleading trade identification or false or deceptive advertising."

■ In the pretrial order, the parties agree that in order to prevail, the plaintiffs must prove that Learjet engaged in a deceptive trade practice when, in the course of its business, it:

(a) caused the likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(b) caused the likelihood of confusion or misunderstanding as to the affiliation, connection, or association with or certification by another;

**14.** The plaintiffs raise the issue in their reply to the defendants' opposition to plaintiffs' motion for partial summary judgment. A reply brief submitted in connection with a different motion is an inappropriate vehicle to respond, for the first time, to an argument raised in Learjet's summary judgment motion. In addition, the arguments made in the reply are unpersuasive. The plaintiffs assert, without any citations in support, that N825D should be considered "goods" and, if not, that the alleged conduct should be considered "other conduct which similarly creates a likelihood of confusion." As explained in the discussion of Count Three, the court rejects both arguments.

(c) disparaged the goods, services, or business of another by false or misleading representation of fact;

(d) engaged in other conduct which similarly created a likelihood of confusion or misunderstanding.

The comment to Uniform Act indicates that the subsection concerning causing the likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services encompasses "confusion as to commercial source, approval, endorsement, or certification of goods or services caused by trademarks, service marks, certification marks, or collective marks likely to be associated with preexisting trade symbols." The comment specifies that the subsection prohibiting causing the likelihood of confusion or misunderstanding as to the affiliation, connection, or association with or certification by another "concerns the likelihood of confusion caused by misleading trade names." The subsection concerning disparaging the goods, services, or business of another by false or misleading representation of fact "reflects the trend of authority allowing businessmen to enjoin disparagement by competitors." Finally, the subsection prohibiting engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding "permits the courts to block out new kinds of deceptive trade practices."

The evidence before the court indicates that N825D is not a good sold or a service rendered by the plaintiffs and, in the opinion of the court, the Georgia statute is inapplicable to the facts of this case. The evidence does not show that Learjet created confusion about a product because of a mark associated with another trade symbol, used a confusing trade name, made disparaging remarks about the products or services of a competitor, or engaged in other deceptive trade practices as defined by the Uniform Act or Georgia law.

Furthermore, a remedy for violation of the act is limited to cases where a plaintiff can demonstrate that it is likely to be injured by a deceptive trade practice. *Lauria*, 312 S.E.2d at 193. In this case, while the plaintiffs allege past injury, the situation leading to that injury has been resolved and there is no indication that the plaintiffs would be subject to injury in the future.[15] The plaintiffs, therefore, are not eligible for injunctive relief under Georgia law. *Lauria*, 312 S.E.2d at 193.

### 6. Common law disparagement

■ In Count Four, the plaintiffs allege that Learjet made "false and misleading statements concerning N825D" that "have diminished the value of N825D." Learjet makes arguments under both Kansas and Georgia law and, in the pretrial order, asserts that Kansas law applies. The plaintiffs maintain that Georgia law applies. As explained above, this court must apply the Kansas choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under the Kansas choice of law provisions, the law of the state where the tort occurs controls and the tort is deemed to have occurred where the wrong was felt. *Ling v. Jan's Liquors*, 237 Kan. 629, 635, 703 P.2d 731 (1985). In the case of alleged financial harm, the court looks to the state in which the plaintiff felt the financial harm. *Bushnell Corp. v. ITT Corp.*, 973 F.Supp. 1276, 1286 (D.Kan.1997); *Altrutech, Inc. v. Hooper Holmes, Inc.*, 6 F.Supp.2d 1269, 1276 (D.Kan.1998). In this case, the alleged harm to the plaintiffs was the diminution in value of N825D, located in Georgia, and the resulting financial loss to the plaintiffs, also located in

---

**15.** The settlement of the FAA enforcement action resolved the dispute regarding the airworthiness of N825D and its compliance with the type certificate for 25D–263.

Georgia. Thus, under the facts of this case, the harm from the alleged disparagement was felt in Georgia and the law of Georgia applies.

As with Count One, the court denies summary judgment based on the arguments made in Learjet's initial summary judgment motion, but grants summary judgment based on the arguments advanced in its supplemental summary judgment motion.

■■■ In Learjet's initial motion, Learjet points out that, under Georgia law, there is a one-year statute of limitations applicable to actions for injury to reputation. O.C.G.A. § 9–3–33. Learjet asserts that the plaintiff "has known since at least 1994 that Learjet listed Ship 263 as 'attrited' from the fleet and that it did not recognize N825D to be a 'Learjet' because it claimed that the logbook did not accurately reflect cycles and times on the component parts of the aircraft and there was inadequate documentation to show that the fuselage systems comply with the Type Certificate for Ship 263."

While Learjet does not develop the argument, the court believes that Learjet is arguing that the statute of limitations runs from the point that the plaintiffs first became aware of Learjet's views and not from the point that the allegedly disparaging remarks were made. O.C.G.A. § 9–3–33 provides that an action for injury to reputation "shall be brought within one year after the right of action accrues." [16] In this case, the cause of action accrued on February 28, 2000, when Learjet made statements to Raytheon about N825D. *Kicklighter v. Woodward*, 267 Ga. 157, 159, 476 S.E.2d 248 (1996) ("[A] cause of action accrues when the plaintiff could have first maintained the action to a successful re-

sult."). The complaint was filed within one year of that date and is not barred by the statute of limitations.

■■■ Learjet also asserts that truth is an absolute defense to a claim for disparagement, but does not develop the argument. As counsel for the plaintiffs pointed out at oral arguments, a true statement can create a likelihood of confusion or misunderstanding if the speaker omits other material information. Such "half-truths," are "often more damaging and devastating than would be an outright falsehood." *Davis v. Macon Tel. Pub. Co.*, 93 Ga.App. 633, 92 S.E.2d 619, 626 (1956). For example, the statement that N825D was "attrited" in 1991 and sold for scrap, even if true, can create confusion or misunderstanding if the speaker knows that N825D was rebuilt or repaired and certified as airworthy but does not disclose this information as well. Thus, even if the statements made by Learjet were true, Learjet does not have an absolute defense to the allegation, set out in the pretrial order, that Learjet made "misleading" statements. Furthermore, the plaintiffs dispute the "truth" of some of the statements made by Learjet. For example, the plaintiffs challenge the allegations that the airplane was "attrited" in 1991 and sold for scrap and that N825D does not meet the Type Certification for 25D–263. Summary judgment, therefore, is not appropriate on the basis that truth is an absolute defense.

■■■ In its supplemental summary judgment motion, Learjet argues that Georgia does not recognize a tort of "common law disparagement." [17] The plaintiffs did not respond either in their papers or at oral argument.

---

**16.** The court does not reach the issue of whether this statute is applicable to the claim.

**17.** At oral argument, counsel for Learjet again asserted that Georgia has not affirmatively recognized the tort.

The plaintiffs allege in the pretrial order that Learjet made false and disparaging remarks about the plaintiffs' property, N825D. The tort of "common law product disparagement" is also known as "trade libel" [18] and, according to the Restatement, applies to "the publication of matter disparaging the quality of another's land, chattels or intangible things." Restatement of Torts § 626. The plaintiffs seem to state a claim for trade libel, or common law disparagement, as set out by the Restatement. The issue is whether Georgia recognizes the tort as it is set out in Restatement section 626.

The Georgia Supreme Court declined to decide whether a cause of action lies for product disparagement, or trade libel, in *Georgia Society of Plastic Surgeons v. Anderson,* 257 Ga. 710, 363 S.E.2d 140, 143–44 (1987). In *Anderson,* the court declined to address the argument that "in Georgia there is no cause of action for damages resulting from disparagement of goods and services (i.e., trade libel)" because "assuming that damages will lie for trade libel, appellants are correct in arguing that in this case such damages constitute an impermissible double recovery." *Id.* The Georgia court has not since revisited the subject.

"Trade libel and product defamation lie within the general rubric of the tort of injurious falsehood, itself born of the cause of action for unlawful interference." *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 919 F.Supp. 756, 762 (D.N.J.1996); *See also* Restatement of Torts §§ 626, 623A. There is no indication in the law of Georgia that the state would adopt section 626 of the Restatement.[19] In fact, Georgia has not recognized the tort of "injurious falsehood." Section 626 of the Restatement simply extends section 623A of the Restatement, applying the elements of injurious falsehood to "the publication of matter disparaging the quality of another's land, chattels or intangible things." In holding that Georgia would recognize "trade libel" as defined in section 626, the court would, in effect, also have to hold that Georgia would recognize the tort of "injurious falsehood" as defined in section 623A.

This area of the law is far from uniform among the states. *See System Operations, Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131,1138 (3d Cir.1977) (noting the slow development of and confusing state of the law); *CMI, Inc. v. Intoximeters, Inc.,* 918 F.Supp. 1068, 1086–89 (W.D.Ky.1995) ("Those grappling with the tort's scope and application are not found exclusively in the jurisdiction of Kentucky."); McCarthy on Trademarks and Unfair Competition § 27:100 (4th ed.) ("Confusion surrounds the tort of 'commercial disparagement' because not only is its content blurred and uncertain, so also is its very name. The tort has received various labels, such as

---

18. According to Dean Prosser:
There is a tort which passes by many names. Sometimes it is called slander of title, sometimes slander of goods, or disparagement of goods, or trade libel, or unfair competition, or interference with prospective advantage, or whatever else the fancy of the particular Judge or writer may lead to select. Under whatever name, the essentials of the tort appear to be the same. It consists of the publication, or communication to a third person, of false statements concerning the plaintiff, his property, or his business.

Dean Prosser, *Injurious Falsehood: The Basis of Liability,* 83 N.J.L.J. 1 (1960) (quoted in *Henry V. Vaccaro Construction Co. v. A.J. DePace, Inc.,* 137 N.J.Super. 512, 349 A.2d 570, 571 (1975)).

19. The *Anderson* court seemed to suggest that the tort, if recognized, would only extend to disparagement of products and services as opposed to the "quality of another's land, chattels or intangible things."

'commercial disparagement,' 'injurious falsehood,' 'product disparagement,' 'trade libel,' 'disparagement of property,' and 'slander of goods.' "); Arlen W. Langvardt, *Free Speech Versus Economic Harm: Accommodating Defamation, Commercial Speech, and Unfair Competition Considerations in the Law of Injurious Falsehood*, 62 Temple Law Review 903, 917 (1989) ("The confusion concerning the appropriate sort and degree of intent or fault is enhanced by the need to consider the level of proof required to demonstrate the defendant's abuse of an otherwise applicable conditional privilege. In its present state, the common law of injurious falsehood is badly in need of coherence and direction with regard to the fault issue"). Without a stronger indication that Georgia would recognize sections 626 and 623A of the Restatement, or a tort containing the elements set out in the pretrial order with regard to Count Four by whatever name one wishes to call it, the court is unwilling to hold that the plaintiffs have stated a valid cause of action under Georgia law. *See CMI, Inc. v. Intoximeters, Inc.*, 918 F.Supp. 1068, 1086–89 (W.D.Ky.1995) ("The Court concludes that there is insufficient authority upon which it could predict that Kentucky courts would establish an entirely new cause of action for injurious falsehood."). Summary judgment, therefore, is granted to Learjet on Count Four.

7. Abuse of monopoly power

▪ In Count Five, the plaintiffs allege that Learjet maintains a monopoly over the market for repair and maintenance of Model 25D airplanes "through Learjet prepared Maintenance Manuals and Repair Manuals; and through agreements with authorized repair facilities and test pilots." The plaintiffs allege in the pretrial order that Learjet abused its monopoly power by making false and misleading statements that N825D fails to meet the "Type Certificate Data Sheet require-

ments for TCA10CE [and] that it had been destroyed and sold for scrap," failing to provide technical support and instructions for continued airworthiness for N825D, limiting maintenance to the leading edge without factory approval to removal and installation and requiring that a new wing leading edge be installed at an authorized Learjet repair facility, requiring that stall tests be performed after the completion of repair to the leading edge and that the test be performed only by Learjet-approved pilots, refusing to provide the plaintiffs or Raytheon instructions for continued airworthiness of N825D, refusing to provide support, information, personnel and equipment needed to repair N825D, and by removing N825D from the list of Learjet aircraft and refusing to recognize it as an active aircraft.

Learjet argues in its initial summary judgment motion that the plaintiffs have failed to identify a market that Learjet is capable of monopolizing and that none of the acts alleged in the pretrial order constitute restraint of trade. In its supplemental summary judgment motion, Learjet argues that there is a lack of evidence showing Learjet holds a monopoly over the relevant market.

▪ Section 2 of the Sherman Act, 15, U.S.C. § 2, makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize" any part of interstate or foreign commerce. Abuse of monopoly power under section two of the Sherman Act has two elements: 1) the possession of monopoly power in the relevant market; and 2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). As the second ele-

ment makes clear, "[t]he mere possession of monopoly power does not ipso facto condemn a market participant." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2 Cir.1979). Instead, violations occur when a company with this power engages in "conduct directed at smothering competition." *Id.*

Learjet argues that, under section two of the Sherman Act, Learjet cannot have a monopoly over its own products. The Supreme Court rejected this argument in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481–82, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citations omitted):

> Kodak also contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act. We disagree. The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners. Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines. This Court's prior cases support the proposition that in some instances one brand of a product can constitute a separate market. The proper

market definition in this case can be determined only after a factual inquiry into the "commercial realities" faced by consumers.

In this case, the plaintiffs allege that Learjet maintains a monopoly over the repair and maintenance of Learjet airplanes. Following *Kodak*, it is possible for Learjet to maintain a monopoly over the service and repair of its airplanes.[20]

In its supplemental summary judgment motion, Learjet points out to the court that there is a lack of evidence indicating the presence of a monopoly in the relevant market. Learjet notes that the plaintiffs have not designated an expert to testify about such a market.

The evidence before the court shows that the Learjet structural repair manual requires that repairs to the leading edge be performed by an authorized Learjet repair facility and that a stall test be performed by a Learjet-approved pilot. The court has not been presented with evidence about the number of authorized repair facilities, the market share of such facilities and the relationship between Learjet and the facilities. The evidence in the record merely establishes that there are facilities other than Learjet that are Learjet-authorized repair facilities. No evidence has been submitted to the court

**20.** Learjet points to the Tenth Circuit decision in *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022 (10th Cir.1992). The Tenth Circuit held that an antitrust claim could not be based on a natural monopoly a company holds over its own product. The court did not address whether such a claim could be based on a monopoly held over the service and repair of its products. To the extent that Learjet argues *TV Communications* stands for the proposition that a single brand of a product or service can never define a relevant market, *Kodak* rejected this argument. *Kodak*, 504 U.S. at 481–82, 112 S.Ct. 2072. Learjet also cites to a decision in *Mellon v. The Cessna Aircraft Co.*, 7 F.Supp.2d 1183 (D.Kan.1998), by Judge Mar-

ten of this court, suggesting that only if a single product holds a monopoly in a market can the producer of that product be said to hold a monopoly. Judge Marten specifically rejected the argument that Learjet now makes: "To the extent that Cessna argues *TV Communications* stands for the proposition that a single brand of a product or service can never define a relevant market, *Kodak* explicitly rejected this position." *Id.* at 1193 (citing *Kodak*, 504 U.S. at 481–82, 112 S.Ct. 2072). Judge Marten held, instead, that the court could only consider whether Cessna held a monopoly over the market for "single-pilot jet aircraft" and not over Cessna planes because only the former was alleged in the complaint.

regarding the number of Learjet-approved pilots or their relationship with Learjet.

Learjet met its summary judgment burden by pointing out to the court a lack of evidence on the first element of a violation of section two of the Sherman Act. *Adler*, 144 F.3d at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The plaintiffs failed to meet their burden to set forth specific facts showing that there is a genuine issue for trial. The evidence before the court is simply inadequate for a reasonable jury to conclude that Learjet has a monopoly over the market for repair and maintenance of Learjet airplanes. Summary judgment, therefore, is granted to Learjet with respect to Count Five.[21]

### 8. Negligence

 In Count Six, as set forth in the pretrial order, the plaintiffs allege that Learjet breached a duty to the plaintiffs "to exercise ordinary care by failing to provide instructions for continued airworthiness and inspection of hydraulic landing gear control valve 48C48603 and by failing to warn Plaintiffs of the dangerous condition." The plaintiffs also allege that Learjet breached its duty "to exercise ordinary care in the design, testing and/or modification of valve 48C48603; and in failing to provide adequate maintenance instructions and/or warnings."

Learjet argues in its summary judgment motion that the claim is barred by the eighteen-year statute of repose established by the General Aviation Revitalization Act ("GARA"), 49 U.S.C. § 40101. The statute provides that "no civil action for . . . damages to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of

the aircraft . . . in its capacity as a manufacturer if the accident occurred" eighteen years after the date of the delivery of the aircraft by the manufacturer to its first purchaser or lessee. Pub.L. No. 103–298, 108 Stat. 1552 (1994) (codified at 49 U.S.C. § 40101 note). According to Learjet, N825D was delivered more than eighteen years before the accident and the lawsuit, therefore, is barred by the statute.

The plaintiffs point out that the statute provides that the applicable limitation period begins anew upon the replacement of a component or part with a new component or part. The plaintiffs argue that the maintenance manual sections concerning the landing gear issued in 1983, the flight manual excerpts issued in 1986 and the service bulletin issued in 1989 should be considered new components or parts. For support, the plaintiffs point to *Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155 (9th Cir.2000). In *Caldwell*, the plaintiffs sued the manufacturer of a helicopter alleging that a flight manual was defective in that it did not include a necessary warning. *Id.* at 1156. The Ninth Circuit was careful to point out that the plaintiffs did not allege negligence based on a failure to warn but "under theories of strict liability and negligence, that the revised manual itself is the defective product that caused the accident." *Id.* at 1157. The court held that the GARA statute of repose did not prohibit the lawsuit because the flight manual was published less than eighteen years before the accident and the flight manual should be considered a new part added to the aircraft, thereby extending the period of time in which a lawsuit could be brought regarding that new part. *Id.* at 1157. The court explained, however,

---

21. Because the court grants summary judgment on the basis that the plaintiffs have not pointed to evidence showing a genuine question for trial regarding whether Learjet has a monopoly over the repair of Learjet airplanes, the court need not address Learjet's argument that none of the acts alleged in the pretrial order constitute restraint of trade.

that in order to state a claim, a plaintiff must allege that an alteration to the flight manual was the proximate cause of an accident. *Id.* at 1158.

Unlike the plaintiff in *Caldwell,* the plaintiffs in this case do not allege that the accident was proximately caused by any of the three documents mentioned in their response. Instead, the plaintiffs allege that the accident was caused by Learjet failing to warn owners of its planes about a defect in the landing gear hydraulic and failing to instruct owners how to fix the defect. Following the rationale of *Caldwell,* the plaintiffs' claim is barred by the statute of repose. The court agrees and holds that this claim is barred by the GARA statute of repose.

9. Mandamus

■ In Count Seven, as set forth in the pretrial order, the plaintiffs allege that Learjet breached a duty created by 14 C.F.R. § 25.1529 and 21.50 "to make available and provide Plaintiffs with instructions for continued airworthiness, technical support, support personnel and special equipment needed to repair and maintain Learjet N825D." The plaintiffs seek an order, pursuant to K.S.A. § 60–801, compelling Learjet to fulfil its duty. The plaintiffs also seek damages pursuant to K.S.A. § 60–802 for the alleged breach.

K.S.A. § 801 grants courts the authority to order a corporation or person "to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law." K.S.A. § 801. Learjet argues in its summary judgment motion that it does not have a duty to provide the requested services and support for N825D. The plaintiffs specify that the duty owed is created by 14 C.F.R. § 25.1529 and 21.50. The regulations require Learjet to provide instructions for continued airworthiness to Learjet air-

plane owners. The regulations do not create any other duty and to the extent that the pretrial order seeks an order compelling Learjet to provide technical support, personnel, equipment, drawings and other information, summary judgment is granted to Learjet on Count Six.

In its supplemental summary judgment motion, Learjet points out that there is a lack of evidence showing that Learjet failed to meet its duty to provide instructions for continued airworthiness to Learjet airplane owners. The plaintiffs did not respond either in their papers or at oral argument. The regulations require that Learjet provide "one set of complete Instructions for Airworthiness" to aircraft owners upon the airplane's delivery and to make "changes to the Instructions for Continued Airworthiness" available to the owners. The evidence does not indicate that Learjet failed to comply with the regulations or that Raytheon's inability to repair N825D was related to the unavailability of the airworthiness instructions. Instead, the evidence indicates that Learjet's refusal to repair the leading edge stopped Raytheon from completing the repairs. *See* 8/23/01 Mark Smith deposition at 133–34. Learjet met its summary judgment burden by pointing out a lack of evidence on an essential element of a mandamus claim and the plaintiffs failed to meet their burden to set forth specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment, therefore, is granted to Learjet with respect to Count Six.

10. Breach of May 1, 2000 contract

■ In Count Ten, as set forth in the pretrial order, the plaintiffs allege that Raytheon breached its contract with the plaintiffs to repair N825D. According to

the pretrial order, Raytheon breached the contract by failing to repair the leading edge of N825D and perform a stall test. The plaintiffs also assert that "an oral provision was added [to the contract] by Plaintiffs that repairs not be commenced unless and until [Raytheon] was sure that it could complete all repairs necessary to return the aircraft to service, including the leading edge of the right wing." This provision was breached, according to the plaintiffs.

Raytheon argues in its summary judgment motion that the claim is precluded by the terms of the May 1, 2000 repair agreement and the supplemental June 23, 2000 agreement. Raytheon points out that the agreements indicate that repairs to the leading edge and the stall test were dependent on support from Learjet. Raytheon characterizes this language as a condition precedent that must occur before the contract is enforceable. Raytheon also argues that the alleged oral statement by Mr. Wilen is inadmissible because of the parol evidence rule. Finally, Raytheon argues that the plaintiffs are not entitled to recover the alleged damages because they are not the "natural and probable consequences" of a breach of the contracts.

■ The parties agree that Georgia law applies to the contracts. Under Georgia law, "precise technical words" are not needed to create conditions precedent. *Fulton County v. Collum Properties*, 193 Ga.App. 774, 388 S.E.2d 916, 918 (1989). Although a condition precedent may be created by language such as "on condition that," "if," and "provided," or by explicit statements that certain events are to be construed as conditions precedent, Georgia law is clear that none of these are prerequisites. *Id.* On the other hand, if the contract's terms are clear and unambiguous and do not clearly establish a condition precedent, Georgia courts will not construe the contract to create one. *Id.*

The May 1, 2000, proposal indicates that the leading edge has "impact damage" and includes a quote for associated parts and labor, presumably to repair the leading edge. The proposal also gives an estimate for a stall test and indicates that the test "shall be dependent upon co-operation of Bombardier/Learjet factory support." The June 23, 2000, proposal lists "items [that] are in addition to, or a revision of" the earlier proposal. The June 23 proposal indicates that the Learjet Structural Repair Manual "stipulates that no field repair to the leading edge is allowed" and that "[a]ll repairs must be performed by Learjet."

Raytheon's statement of uncontroverted facts, paragraph 52, states that, "[o]n June 23, 2000, Mark Smith on behalf of [Raytheon] forwarded to plaintiff Wilen on behalf of J.W. Equities and Carolina [Products] an amendment and supplement to the May 1, 2000, repair contract discussed above." The statement is supported by citations to the June 23 agreement and Mark Smith's deposition. In his deposition, Mr. Smith testified that on June 23, he faxed to Mr. Wilen a second, amended proposal revising the estimate for repairs to the leading edge. *See* 8/23/01 Mark Smith deposition at 37–41. Mr. Smith testified that he issued "the amended quotation" after he learned of the requirement that the leading edge be repaired by a Learjet-authorized repair facility. *See* 8/23/01 Mark Smith deposition at 67. The June 23 proposal includes a revised quotation for repairs to the leading edge, including an estimated charge for "outside service" for Learjet to repair the leading edge. The plaintiffs respond to the statement of uncontroverted facts with the statement: "Disputed that the June 23, 2000 [agreement] is a modification or amendment to the May 1, 2000 agreement." The plaintiffs do not cite to the record as required by D. Kan. Rule 56.1.

At oral argument, counsel for the plaintiffs asserted that the language which Raytheon contends creates a condition precedent relating to repair of the leading edge "wasn't agreed to in the May 1 agreement" and argued that the June 23 proposal was not an amendment to the May 1 agreement, saying "they have purported to amend that contract but they have amended a different contract later in June." The June 23 proposal indicates that "these items are in addition to, or a revision of, proposal number 20110096, dated 5/31/00." The May 1 proposal is proposal number 200110081.

The terms of the June 23 contract clearly relate to the repairs to N825D that are the subject of the May 1 agreement. There is no evidence in the record of an agreement to repair N825D other than the May 1 and June 23 agreements. The plaintiffs treat the June 23 agreement as an amendment to the May 1 agreement in the pretrial order, stating in section 5.1 that: "On June 23, 2000, [Raytheon] sent out a revised repair agreement which provided that the wing repair would have to be completed by Learjet representatives." [22] Most significantly, the plaintiffs failed to point to evidence controverting Raytheon's statement of fact alleging that the June 23 agreement was "an amendment and supplement to the May 1, 2000, repair contract." Pursuant to D. Kan. Rule 56.1, the plaintiff's failure to point to evidence in the record controverting the fact constitutes an admission of the fact.[23]

The court construes the language in the May 1 and June 23 agreements as conditions precedent. The language in the May 1 proposal indicates that the completion of the stall test is dependent upon the cooperation of Learjet. While the language was not precise, Georgia law does not require precise language to create a condition precedent. The June 23 proposal, which, by its terms, is a revision of the earlier proposal, indicates that Raytheon cannot repair the leading edge and that, instead, Learjet must make the repairs. This language, at minimum, establishes that Learjet's agreement to repair the leading edge is a condition precedent to any contribution by Raytheon to the task.[24]

It is well settled that, in certain circumstances, a party to a contract may be estopped from enforcing a condition precedent. O.C.G.A. § 13–3–44; *Chicago Ins. Co. v. Central Mutual Ins. Co.*, 229 Ga.App. 291, 494 S.E.2d 1, 3 (1997). In this case, the plaintiffs argue that Raytheon should be estopped from asserting the conditions precedent as a defense because Raytheon began repairs to N825D, not including repair to the leading edge or stall test, despite the plaintiffs' instruction not to begin until all repairs could be completed. The factual dispute about whether this instruction was given need not be resolved because, even if Raytheon began repairs in spite of this instruction, the plaintiffs have not alleged or submitted evidence indicating that they relied on Raytheon's actions, such as by forbearing

**22.** Also in the pretrial order, the parties agree that the first element of Count Ten, breach of the May 1, 2000 contract, is that "the May 1, 2000 and the June 23, 2000 agreements between Plaintiffs and [Raytheon] contained promises that are legally enforceable."

**23.** If the court did not believe that the fact was deemed admitted, the court would hold that on the basis of the evidence before the court, no reasonable jury could find that the June 23 agreement did not amend the May 1

agreement. There simply is no indication that the plaintiffs and Raytheon had entered into any other agreement that it could have modified or that this document was not intended to govern the relationship between the plaintiffs and Raytheon concerning repair of the leading edge. The court also notes that the plaintiffs do not challenge the validity of the June 23 agreement.

**24.** Raytheon lists charges in addition to "outside labor" and "parts" in the proposal.

from seeking others to undertake the repairs on the assumption that they could be completed by Raytheon. Under Georgia law, the party seeking estoppel must be able to show reliance upon the conduct. *Horne v. Exum,* 204 Ga.App. 337, 419 S.E.2d 147, 148–49 (1992) (quoting *Bell v. Studdard,* 220 Ga. 756, 141 S.E.2d 536 (1965)). Absent evidence of detrimental reliance, the plaintiffs' argument for estoppel is without merit. *Felton v. Highlands Hotel Co.,* 165 Ga. 598, 141 S.E. 793, 798 (1928) ("The plaintiff in the present case is not estopped to rely upon the breach of the condition precedent to which we have referred, because estoppel cannot arise unless the party sought to be estopped has done some act by which the situation of the opposite party has been altered to his injury.").

The plaintiffs also allege that the contract was breached by Raytheon beginning repairs "knowing that it could not complete the repairs and return the aircraft to service within 20 working days or within any period of time." [25] Raytheon argues that any evidence of the alleged oral provision is inadmissible because of the parol evidence rule. The plaintiffs did not respond in their written response or at oral argument. In Georgia, "[p]arol evidence is not admissible to add to, take from, or vary [a] written contract." O.C.G.A. §§ 13–2–2; *Thomas v. American Global Ins. Co.,* 229 Ga.App. 107, 493 S.E.2d 12, 15 (1997) ("parol evidence is admissible to explain an ambiguity in a written contract, although such evidence is inadmissible to add to, take from, or vary the writing itself."). On the other hand, "if only a part of a contract is reduced to writing (such as a note given in pursuance

of a contract) and it is manifest that the writing was not intended to speak to the whole contract, then parol evidence is admissible." O.C.G.A. §§ 13–2–2. "If the writing appears on its face to be an incomplete contract and if the parol evidence offered is consistent with and not contradictory of the terms of the written instrument, then the parol evidence is admissible to complete the agreement between the parties." *Jordan v. Tri County AG, Inc.,* 248 Ga.App. 661, 546 S.E.2d 528, 531 (2001).[26]

Georgia case law allowing the admission of parol evidence to complete a contract is easily distinguished. For example, in *Thomas v. Clark,* 178 Ga.App. 823, 344 S.E.2d 754, 755 (1986), at issue was a lease which "contained the following uncompleted provision: '1. Lessor does hereby rent and lease to the Lessee the following described property ... for a term commencing on the _____ day of _____, 19__, and ending on the _____ day of _____, 19__, at midnight.' " The Georgia court reasoned that because the lease was obviously incomplete, as "the lease shows on its face," that "parol evidence was admissible to establish the term of the lease and complete the agreement." If the facts of the case make it obvious that the contract is incomplete, parol evidence is admissible. *See Jordan v. Tri County AG, Inc.,* 248 Ga. App. 661, 546 S.E.2d 528, 531 (2001) ("The line of credit agreement, which was drafted by Garrett without the aid of an attorney, makes no reference to payments or obligations to pay the line of credit. It is axiomatic that such provisions are integral to any credit agreement, and it cannot be the intent of the parties herein that no such terms existed."); *Doyle v. Estes*

---

**25.** The plaintiffs do not argue that the oral statement was an independent contract, supported by additional consideration.

**26.** Georgia case law does not mention the Restatement's approach to the use of parol evidence to prove consistent, additional terms to a contract that is not completely integrated. *See* Restatement (Second) of Contracts § 216.

*Heating & Air Conditioning, Inc.,* 173 Ga. App. 491, 326 S.E.2d 846, 848 (1985) ("Here, the contract is silent as to the parties' responsibilities following the installation of the equipment. We do not think the parties intended the contract to be a complete statement of the work to be performed. Surely, following the installation of the equipment, further work remained: debris was to be cleared; the premises were to be cleaned; the equipment was to be tested and started up; and the hole in the bathroom wall was to be repaired."). Georgia courts do not allow parol evidence of a condition precedent unless the contract is not obviously incomplete. *See Lyon v. G.M. Patterson,* 138 Ga.App. 816, 227 S.E.2d 423, 425–26 (1976) (recognizing that "the rule which has evolved in most jurisdictions" permits parol evidence of a condition precedent "unless the alleged condition is clearly contrary to the terms of the writing," but holding that, in Georgia, parol evidence cannot be used to show that an additional condition is required for the contract to be enforceable).

In this case, the May 1 contract, as modified by the June 23 contract, does not appear on its face to be an incomplete contract and the circumstances of the case also do not lead the court to believe that the contract is incomplete. The contract is not obviously missing any key provision, there are no blanks to be filled in, and it is not an axiom that all such contracts contain a provision addressing whether the service provider should begin work only after it is determined that the work can be completed. The only basis for the court to conclude that the contract is incomplete is consideration of parol evidence. In a situation such as this, the Georgia parol evidence rule is intended to preclude the admission of parol evidence. *See Lyon,* 227 S.E.2d at 425–26 (Ga.Ct.App.1976) ("The omission of any such additional contingency in the writing precludes the offer of proof upon it in the absence of fraud, accident or mistake, none of which is alleged here."); *Goodman v. Frolik & Co.,* 233 Ga.App. 376, 504 S.E.2d 223 (1998) ("When a contract such as a real estate listing agreement is silent as to a purported obligation, parol evidence of additional terms or 'understanding' is not admissible to add to or vary from the written contract: '[a]n additional obligation cannot be grafted thereon by parol evidence.' ").

Because the three grounds for the plaintiffs' breach of contract claim are precluded by either a condition precedent or the parol evidence rule, the court grants summary judgment to Raytheon on Count Ten.[27]

## 11. Negligence

In Count Eleven, as set forth in the pretrial order, the plaintiffs allege that because Raytheon "had a duty to Plaintiffs to advise them that the FAA Atlanta FSDO might question [the] September, 1992 log book entries concerning repair of N825D; to advise Plaintiffs of the existence of Learjet Service Bulletin SB23/24/25–340 and consequences for failing to comply with the Service Bulletin during May, 1994 and at each other time it performed maintenance and inspections on the aircraft; and to have replaced hydraulic landing gear selector valve 48C48603 with valve 48C48641 during the April, 1999 inspection performed on the aircraft."

Raytheon argues that the damages sought by the plaintiffs are barred by the economic loss rule, that the claim is barred

---

**27.** Because the court grants summary judgment to Raytheon on Count Ten, it need not address Raytheon's third argument that the plaintiffs are not entitled to recover the alleged damages because they are not the "natural and probable consequences" of a breach of the contracts.

by the statute of limitations, that its conduct was not the proximate cause of the plaintiff's injuries, and that Mr. Wilen's emotional distress claims are not recoverable under Georgia law. The court denies summary judgment on the basis of the economic loss rule and the statute of limitations but grants summary judgment to Raytheon based on the absence of proximate cause and the inability to recover for emotional distress absent physical harm.

Raytheon argues that the damages sought by the plaintiffs in Count Eleven are barred by the economic loss rule. The plaintiffs "concur that in Georgia, the economic loss rule precludes purely economic losses in strict liability cases and product liability cases where negligence is alleged" but suggest that the rule does not apply to a claim of ordinary negligence. In Georgia, "[t]he economic loss rule provides that absent personal injury or damage to property other than to the allegedly defective product itself an action in negligence does not lie and any such cause of action may be brought only as a contract warranty action." *Holloman v. Horton*, 524 S.E.2d 790, 796 (2000). "The rationale underlying this rule is that when a defective product has resulted in the loss of the value or use of the product itself, or the cost of repairing it, the plaintiff is merely suing for the benefit of his bargain." *Id.* In this case, the plaintiffs are suing for damage caused to N825D as a result of negligent work done by Raytheon, not for the reduced value of a defective product. The plaintiffs' claim for damages, instead, is based on damage to property and the consequential loss of use of that property. This is distinguishable from the case cited by Raytheon, *Baltimore Football Club v. Lockheed Corp.*, 525 F.Supp. 1206, 1210 (N.D.Ga.1981), because the plaintiffs in that case were suing the manufacturer of an airplane for the reduced value of the airplane caused by defects in the airplane itself. The court concludes that because the plaintiffs are suing for damage to property caused by negligence and not for the diminished value of a defective product, the Georgia economic loss rule does not apply.

Raytheon argues, next, that Count Eleven is barred by the statute of limitations. The parties agree that the Kansas two-year statute of limitations in K.S.A. § 60–513 is applicable. The plaintiffs argue that the statute of limitations "should be tolled by reason of the fact that [Raytheon] continuously maintained possession of the aircraft records and log books and that it continuously certified through at least December, 1999 that the aircraft was in compliance with the FARs and was in airworthy condition." Raytheon responds by pointing out that the statute of limitations begins to run at the time of a negligent act if both the act and the resulting injury are reasonably ascertainable and arguing that "any negligence that occurred concomitant to the 1994 work was reasonably ascertainable at the time."

K.S.A. § 60–513(b) provides that a cause of action to which the two-year statute of limitations is applicable "shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action." K.S.A. § 60–513(b). Raytheon argues that the "injury" suffered by the plaintiffs "could have been perceived or predicted just as easily by them as anyone else as of no later than June of 1994."[28]

---

**28.** Mr. Wilen testified in his deposition that both he and his pilot, Lee Ramsey, had access

The evidence in the record indicates that the plaintiffs did not, in fact, suffer an injury until October 19, 2000, when the FAA issued an order suspending the airworthiness certificate of N825D. *See Roe v. Diefendorf,* 236 Kan. 218, 223, 689 P.2d 855 (1984) (construing the phrase "substantial injury" in K.S.A. § 60–513q(b) to mean "actionable injury"). While the evidence indicates that the plaintiffs had access to the log books since 1994, the record contains no evidence indicating that the plaintiffs suffered an actionable injury prior to October 2000. Because this claim was brought within two years of October 2000, the court denies summary judgment on the basis of the statute of limitations.

In the pretrial order, the plaintiffs specify that they are seeking damages for the cost of repair to N825D, the diminished value of N825D caused by the delay in repairs, damages for lost use of N825D caused by the delay in repairs, and damages for Mr. Wilen's emotional distress. Raytheon argues that its allegedly negligent conduct is not the proximate cause of these damages. The court grants summary judgment, in part, on this basis.

 "While the question of proximate cause is usually submitted to the jury as a question of fact, it may be decided as a matter of law where the evidence shows clearly and palpably that the jury could reasonably draw but one conclusion, that the defendant's [negligent acts] were not the proximate cause of the injury." *Smith v. Ontario Sewing Machine Co.,* 249 Ga. App. 364, 548 S.E.2d 89, 96 (2001) (quoting *Powell v. Harsco Corp.,* 209 Ga.App. 348, 433 S.E.2d 608 (1993)). Raytheon argues

that the court should grant summary judgment on the basis of a lack of proximate cause without submitting the question to the jury. The court grants summary judgment, in part, because the court believes that no reasonable jury could conclude that certain damages were proximately caused by the alleged negligence of Raytheon.

 Under Georgia law, a harm must be a foreseeable result of negligence to establish liability. *Dry Storage Corp. v. Piscopo,* 249 Ga.App. 898, 550 S.E.2d 419, 420 (2001). "A wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience." *Id.* The plaintiffs allege that in the course of maintaining N825D, Raytheon failed to warn the plaintiffs of Learjet Service Bulletin 23/24/25–340, that this failure caused the plaintiffs not to replace the hydraulic solenoid valve and that the faulty valve caused the February 2000 landing accident. Raytheon argues that it was not foreseeable that the failure to bring the service bulletin to the plaintiffs' attention would lead to an accident. According to Raytheon, such a conclusion requires the inference that if Raytheon informed the plaintiffs about the bulletin, that the plaintiffs would have agreed to replace the valve and that the replacement would have prevented the February 2000 accident. The plaintiffs argue that emotional distress, damage to the aircraft, loss of use and diminished value are all foreseeable consequences of the negligence.

to the logbooks even though they were kept by Raytheon. Mr. Wilen also testified that he believed that Mr. Ramsey occasionally reviewed the logbooks. Mr. Ramsey also testified at his deposition that he had reviewed the logbooks. In response to the statement of facts citing to this evidence, the plaintiffs assert that they dispute that Raytheon kept the

logbooks at the plaintiffs' request and that Mr. "Ramsey would take the briefcase [containing the logbooks] from time to time." The plaintiffs do not point to any evidence controverting the fact that Mr. Wilen and Mr. Ramsey had access to the logbooks and occasionally reviewed them.

Raytheon has failed to persuade the court that a reasonable jury could not conclude that an accident is a foreseeable result of the failure to identify a service bulletin recommending the replacement of a part and will not grant summary judgment with respect to damage to N825D caused by the landing accident. Raytheon points out that Service Bulletin 23/24/25–340 was not a mandatory bulletin. The plaintiffs allege that brake failure caused the February 2000 accident and Raytheon points out that "the history leading up to the issuance of this service bulletin involved retracting landing gears, not any incidents involving brake loss." The court notes that there is evidence in the record indicating that Raytheon would not be expected to foresee an accident caused by brake loss. *See* 8/23/01 Mark Smith deposition at 109 (explaining that the bulletin addressed "a situation where the nose landing gear would inadvertently collapse where batteries were turned off"); Learjet Service Bulletin 23/24/25–340 ("This Bulletin eliminates the requirement for the placard to bleed off hydraulic pressure prior to turning off electrical power."). For the plaintiffs to be able to recover, however, only an accident needs to be foreseeable, not the actual cause of the accident. *Bailey v. Jim's Minit Market, Inc.,* 242 Ga.App. 518, 529 S.E.2d 436 (2000) (holding that in order for a party to be liable for negligence, the party need only have foreseen "that some injury would result from his act or omission" as opposed to the specific injury that occurred). Raytheon has not pointed to evidence indicating that the accident, even if caused by the failure of the landing gear, was not foreseeable. While it is not disputed that the bulletin was recommended, as opposed to mandatory, Raytheon has not presented the court with evidence explaining the significance of this distinction. Intuitively, a recommended bulletin is less significant than a mandatory bulletin, but this does not preclude the possibility that a jury could find that an accident is the foreseeable result of the failure to comply with a recommended bulletin. Raytheon has not presented the court with evidence sufficient for the court to conclude, as a matter of law, that an accident was not a foreseeable consequence of failing to comply with the service bulletin and the court declines to grant summary judgment on that basis.[29]

■■■ On the other hand, the court agrees that no reasonable jury could find that it was foreseeable that the repairs to N825D, including the stall test, would require assistance from a Learjet-authorized facility, that Learjet would refuse assistance and that N825D would not be repaired because the plaintiffs believed that only Learjet could make the repairs and perform the stall test.[30] The plaintiffs seek damages for the loss of use of N825D and the diminished value of N825D, both of which were caused by the long delay in repairing the airplane. The evidence is uncontroverted that the long delay in repairing N825D was the result of Learjet's refusal to repair the leading edge and the plaintiffs' belief that only Learjet could repair N825D. Learjet's refusal to repair the leading edge and the plaintiffs failure

---

**29.** Likewise, the court believes that a jury could conclude that emotional distress to the pilot involved in an accident is a foreseeable consequence of failure to comply with the service bulletin. The court need not reach this issue, however, because, as explained below, the law of Georgia precludes recovery for Mr. Wilen's emotional distress.

**30.** The evidence is uncontroverted that the Learjet repair manual required that replacement of the leading edge be completed by a Learjet-authorized repair facility, that Learjet refused the work, and that the plaintiffs left N825D in storage with Raytheon because Learjet refused to complete the repairs.

to seek repairs from a Learjet-authorized repair facility are superseding causes of the loss of use and diminished value of N825D because they were not foreseeable. *Davis v. DeKalb Co. Hospital Authority,* 162 Ga.App. 477, 291 S.E.2d 131, 133 (1982). ("where [an] intervening cause was of such a nature that it could not have been foreseen reasonably to be the result of the prior negligence, it becomes the proximate cause, even though the ultimate injury would not have occurred except for such original negligence."). The evidence indicates that Raytheon did not know that repair to the leading edge would require the assistance of Learjet until June 23, 2001, over four months after the accident and over two years after Raytheon last performed maintenance on N825D. *See* 8/23/01 Mark Smith deposition at 67. The record also contains no evidence indicating that Raytheon knew or should have known that Learjet would refuse to service N825D. Because the record contains no such evidence and because the need for a Learjet-authorized repair facility, Learjet's refusal of assistance, and the plaintiffs' failure to otherwise repair N825D are not natural and probable consequences of an accident, Raytheon's negligence cannot be said to be the proximate cause of the long delay in repairing N825D.

[T]he inquiry as to natural and proximate cause and consequence is to be answered in accordance with common sense and common understanding ... A natural consequence is one which has followed from the original act complained of, in the usual, ordinary, and experienced course of events .... [not] all such as upon a calculation of chances would be found possible of occurrence, or such as extreme prudence might anticipate, but only those which ensue from the original act without any such extraordinary coincidence or conjunction of circumstances as that the usual course of nature should seem to have been departed from.

*Cope v. Enterprise Rent–A–Car,* 250 Ga. App. 648, 551 S.E.2d 841, 843–44 (2001) (quoting *Southern R. Co. v. Webb,* 116 Ga. 152, 42 S.E. 395 (1902)).

The plaintiffs allege that Raytheon negligently performed maintenance of N825D. While a jury could conclude that an accident is a foreseeable result of negligent maintenance, there is no basis for it to conclude that the long period of time where N825D was not repaired because of a dispute between Learjet and the plaintiffs was foreseeable. Even taking the facts in the light most favorable to the plaintiffs, no reasonable jury could conclude that it was foreseeable that Learjet would refuse to repair the leading edge and that N825D would remain unrepaired for such a long period of time. Summary judgment on this basis is appropriate. *See Deese v. NationsBank of Georgia,* 474 S.E.2d 18, 21 (1998) (holding that even if NationsBank was negligent, the evidence shows that the plaintiff's own actions were the proximate cause of his injuries and, therefore, summary judgment was appropriate).

The court also believes that no reasonable jury could find that it was foreseeable that there would be a sharp decline in the market for airplanes while N825D was awaiting repairs that would reduce the value of N825D. There is no evidence in the record to show that Raytheon should have foreseen a dramatic fall in the market. The only basis in the record on which a jury could conclude that the sudden change in market conditions was foreseeable is that Raytheon is in the business of repairing airplanes. The court does not believe that a reasonable jury could find foreseeability on that basis. *See, e.g., Meyer v. Wagner,* 2000 WL 33181155, * 7 (Mass.App.Ct. Aug 4, 2000) (holding that the plaintiff could not prove proximate cause where her damages were based on a decline in the real estate market, remark-

ing that the defendant "cannot be held to the standard of a fortune teller"). The court holds that no reasonable jury could find that the loss of use and diminished value claimed by the plaintiffs are foreseeable consequences of the alleged negligence and that the plaintiffs may not recover these damages.[31]

 Raytheon argues, next, that Mr. Wilen cannot recover for his emotional distress because emotional distress is not recoverable for breach of contract and is only recoverable for negligence when there is an accompanying physical injury. The plaintiffs respond by arguing that "the Georgia Supreme Court ... provided opportunities to circumvent" the rule requiring a physical injury and the circumstances of this case "at minimum give rise to a jury question as to the amount of emotional distress that was sustained from traveling at nearly 100 miles per hour toward a retention pond with no brakes." The rule in Georgia requires three elements be proven for a plaintiff to recover for emotional distress: "(1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical injury to the plaintiff causes the plaintiff's mental suffering or emotional distress." *Lee v. State Farm*

*Mutual Ins. Co.*, 272 Ga. 583, 533 S.E.2d 82, 85 (2000). The Georgia Supreme Court in *Lee* declined to abandon the rule in favor of another, noting that the court "decline[s] to adopt any rule which might, in effect, create a separate tort allowing recovery of damages for the negligent infliction of emotional distress." *Id.* at 86. Instead, the court extended the rule to allow "recovery for emotional distress to an incident in which the distress is the result of physical injury negligently inflicted on another." *Id.* In this case, Mr. Wilen has not alleged a physical injury or that his emotional distress was caused by the physical injury of another person. Under Georgia law, thus, Mr. Wilen cannot recover for his claim of emotional distress.

In sum, the court holds that no reasonable jury could find that Raytheon could have foreseen the delay in repair and change in market conditions that are the basis of the plaintiffs' damages for loss of use and diminished value. The court declines to grant summary judgment on the basis that no reasonable jury could have foreseen an accident would be caused by the failure to notify the plaintiffs that N825D was not in compliance with Learjet Service Bulletin 23/24/25–340. Finally, under Georgia law, Mr. Wilen cannot recover for emotional distress.[32]

---

**31.** With respect to Raytheon's argument that it was not foreseeable that the FAA would suspend the airworthiness certificate for N825D, the court need not reach the issue because, as explained in connection with Count One, there is an absence of evidence indicating that the suspension of the airworthiness certificate caused N825D not to be promptly returned to service or sold. Instead, the evidence indicates that it was Learjet's refusal to repair the leading edge or perform a stall test and the plaintiffs' failure to have N825D repaired by a Learjet-authorized facility that prevented N825D from being returned to service or sold.

**32.** Raytheon also argues that the plaintiffs' claim for negligence is "barred for lack of any

expert testimony on duty or breach." Raytheon, however, concedes that the plaintiffs' expert, Dr. Murray, intends to testify on the subject of standard of care, but seeks exclusion of that testimony in its motion to exclude Dr. Murray's testimony (Doc. 199). If the court allows Dr. Murray to testify, the defendant's argument is without merit. If the court excludes the testimony of Dr. Murray, summary judgment would be appropriate because, under either Georgia or Kansas law, expert testimony is necessary to establish duty and breach in cases of professional services because the standard of care is not obvious to a jury. *See Moore v. Associated Material and Supply Co., Inc.*, 263 Kan. 226, 234–35, 948 P.2d 652 (1997) (reading precedent to indicate that "when plaintiffs are attempting to

### 12. Breach of the May 1994 contract

In Count Twelve, the plaintiffs allege that Raytheon breached its May 9, 1994 contract with Raytheon. The plaintiffs allege that "the agreement required [Raytheon] to thoroughly research and inspect all records of the aircraft and assure that they were complete and in compliance with the requirements of the Federal Aviation Administration as interpreted by the Atlanta Flight Standards District Office" and "advise Plaintiffs of all outstanding service bulletins and to fully comply with service bulletins if Plaintiffs elected to purchase the aircraft." The plaintiffs allege that the agreement was breached by Raytheon "failing to advise Plaintiffs of service bulletin 23/24/25–340, by failing to inspect, test and/or replace valve 48C48603 with valve 48C48641 and failing to determine whether the records of the aircraft met the requirements of the Atlanta Flight Standards District Office."

■■■ Raytheon argues that the claim is barred by the statute of limitations. The plaintiffs did not respond in their written response or at oral argument. The pretrial order does not address which statute of limitation is applicable. Raytheon, however, argues in connection with Count Eleven that the court should apply the Kansas statute of limitations. A federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Kansas treats statutes of limitation as procedural for choice of law questions and, therefore, applies Kansas statutes of limitation even when the law of another jurisdiction governs a case. *Wortman v. Sun Oil Co.*, 241 Kan. 226, 232, 755 P.2d 488 (Kan.1987). The Supreme Court has reviewed this decision to apply Kansas statutes of limitations and affirmed it as constitutional. *Sun Oil Co. v. Wortman*, 486 U.S. 717, 721–29, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988).

Under Kansas law, the five-year statute of limitations created by K.S.A. § 60–511 applies to written contracts. The contract in issue is dated May 9, 1994. The plaintiffs filed this action August 11, 2000, more than five years after the contract was entered. The claim, therefore, is barred by the statute of limitations and summary judgment is granted to Raytheon.

### 13. Breach of the 1999 contract

■■■ Count Thirteen, as set forth in the pretrial order, alleges that Raytheon breached the April 4, 1999, contract requiring Raytheon "to inspect and repair the aircraft and return it to service in accordance with the contract" by "failing to identify and comply with Service Bulletin 23/24/25–340; and failing to inspect, test and/or replace valve 48C48603 with valve 48C48641."

Raytheon argues that the "work plaintiffs complain of was governed by a work order contract," the terms of which Raytheon argues bar the claim. The work-order includes "Terms and Conditions" limiting Raytheon's liability to "repair and replacements" for "failure to perform Labor in accordance with Standards" and requires that an action for breach of warranty be brought within one year. The plaintiffs allege that the work-order was

establish negligence based upon a departure from the reasonable standard of care in a particular profession, expert testimony is required to establish such a departure."); *H. Elton Thompson & Assoc. v. Williams*, 164 Ga.App. 571, 298 S.E.2d 539, 540 (1992)

("Expert testimony is required because the court and jury are not permitted to speculate as to the standard against which to measure the acts of the professional in determining whether he exercised a reasonable degree of care.").

signed by a Raytheon employee "without the knowledge or consent of Joe Wilen" and argue that the limits on liability, therefore, are not enforceable. Raytheon does not submit evidence to the court showing that the plaintiffs accepted the terms of the work-order. The work-order is not signed by the plaintiffs. The only evidence before the court of a contract is the signed March 1, 1999 proposal, which does not include the limiting terms that are part of the work-order. Absent any evidence that the plaintiffs accepted the terms of the work-order and formed a contract, the court will not grant summary judgment based on the terms of the work-order.

■ Raytheon also argues that the damages sought to be recovered by the plaintiffs are too speculative. In the pre-trial order, the plaintiffs specify that they are seeking damages for the cost of repair to N825D, the diminished value of N825D caused by the delay in repairs, damages for lost use of N825D caused by the delay in repairs, the cost incurred in defending the FAA action, and damages for Mr. Wilen's emotional distress. Initially, the court notes that damages for emotional distress are not recoverable in a breach of contract claim. *Bauer v. North Fulton Medical Center, Inc.,* 241 Ga.App. 568, 527 S.E.2d 240, 245 (1999) ("Because Bauer's claims for mental pain and suffering are not pecuniary damages, they cannot be recovered pursuant to her contract claims."); *Brinson v. First American Bank of Georgia,* 200 Ga.App. 552, 409 S.E.2d 50, 53 (1991) ("there is no merit in Brinson's argument that his magistrate court action is not res judicata as to his claim for damages for emotional distress, since such damages cannot be awarded in a contract action."). Summary judgment is granted to Raytheon to the extent that the plaintiffs seek damages for emotional distress.

"Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." O.C.G.A. § 13-6-2. The plaintiffs do not respond specifically, but, earlier in their response, argue that "emotional distress, damage to the aircraft, lost use and diminished value are foreseeable and natural consequences of aircraft crashes."

■ With respect to the plaintiffs' claim of damages in the amount of the cost of repairs to N825D, the court declines to grant summary judgment. The terms of a contract are central to the question of what damages arise naturally from a breach and that the parties contemplated when entering into the contract. Before the court are the work-order and the March 1, 1999 proposal. These documents reflect an agreement to complete a "300/600/1200 hour inspection." The elements of a "300/600/1200 hour inspection" are not disclosed by the contract and, thus, the meaning of the phrase is ambiguous. Under Georgia law, "the trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction (OCGA § 13-2-2); if after doing so the trial court determines that an ambiguity still remains, the jury must then resolve the ambiguity." *Deep Six, Inc. v. Abernathy,* 246 Ga.App. 71, 538 S.E.2d 886, 888 (2000). O.C.G.A. § 13-2-2 sets out nine rules of contract construction in Georgia. In this case, the rules of contract construction do not aid the court in interpreting the components of a "300/600/1200 hour inspection," the terms of the contract, therefore, remain ambiguous and a jury must resolve the ambiguity. Because the terms of the contract are key to determining whether the damage to N825D caused

by the accident arose naturally from a breach of the contract and were within the contemplation of the parties, the court denies summary judgment with respect to the claim for damages in the amount of the repair costs for N825D.

 The court grants summary judgment to Raytheon to the extent that the plaintiffs seek damages for the diminished value of N825D caused by the delay in completing repairs, the loss of use caused by the same delay, and costs in defending the FAA action. "Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." O.C.G.A. § 13-6-2. The plaintiffs allege that the loss of use and diminished value resulted from the long delay in repairing N825D. The evidence in the record indicates that the long delay in repairs was the result of Learjet refusing to repair the leading edge and the plaintiffs' belief that only Learjet could make the repairs. The evidence in the record also indicates that Raytheon did not know when entering into the 1999 contract that Learjet's assistance would be needed to make repairs to the leading edge, *see* 8/23/01 Mark Smith deposition at 67, and there is no evidence showing that Raytheon knew that Learjet would refuse to repair N825D. The 1999 contract was for performance of regular maintenance. While an accident causing damage to N825D would arguably flow naturally from the breach of a maintenance contract, damages for loss of use and diminished value caused by a long delay in repairing N825D would not. Because the plaintiffs failed to point to evidence showing that the parties contemplated the unique circumstances causing the delay in repairing N825D at the time they entered the 1999 contract, the court holds that the plaintiffs have failed to show that there is a genuine

issue for trial and grants Raytheon summary judgment. *See, e.g., Tube City, Inc. v. Boston & Maine Corp.,* 170 F.Supp.2d 35, 35–36 (D.Me.2001) (citing *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145 (1854), and granting summary judgment because damages arising from delay in delivering scrap iron did not naturally flow from a breach of the contract and there was no evidence indicating that were in the contemplation of the parties when entering into the contract).

 As explained with respect to Count Eleven, the court holds that no reasonable jury could conclude that negligence in conducting maintenance pursuant to the 1999 contract was the proximate cause of the diminished value of N825D or the loss of use of N825D. "The proximate cause concept of the law of torts and in a breach of contract seem to differ only in that the probable and natural consequences of the breach must have been foreseeable at the time the contract was entered into." *National Hills Shopping Center, Inc. v. Ins. Co. of North America,* 308 F.Supp. 248, 251 (S.D.Ga.1970). Georgia law, and indeed the law of most states, limits the damages recoverable for breach of contract more strictly than damages recoverable for negligence. *See Olsen & Co. v. Lunsford,* 99 Ga.App. 215, 108 S.E.2d 304, 305–06 (1959) ("In an action on a contract those damages are recoverable which may reasonably be considered to have been within the contemplation of the parties, while in tort the wrongdoer is liable for all consequences which naturally and proximately follow from his wrongful act, and it is immaterial that such damages were not within the contemplation of the parties at the time the contract was made."); 5 Corbin on Contracts § 1019 (1964) ("The limitation of damages for breach of contract to injuries that the defendant had reason to foresee when the

contract was made is not identical with the rule that is often given as applicable in actions for damages in tort. In the latter cases the defendant may be required to pay for injurious results of this tortious conduct that he had no reason to foresee when his conduct occurred."). Thus, for the reasons that the court holds that these damages are not recoverable in a negligence claim, the court also holds that the damages are not recoverable in a breach of contract case.

The court also believes that no reasonable jury could find that, at the time the parties entered into the contract, they contemplated the possibility that a breach of the contract would cause an FAA action to suspend the airworthiness certificate of N825D. Even assuming that the contract is as characterized by the plaintiffs, for the inspection of all unairworthy parts on N825D, the evidence indicates that the FAA proceeding was based on the plaintiffs' failure to maintain records showing that N825D conforms to the Type Certificate for 25D–263, not based on an unairworthy condition that would be revealed by a maintenance inspection of the airplane. While the plaintiffs allege that the failure to meet type certificate requirements makes an airplane unairworthy by definition, there is no evidence in the record suggesting that the maintenance to be performed under the 1999 contract included a review of the airplane's records to determine if it complied with the type certification. The evidence, in fact, indicates otherwise. The plaintiffs allege that such a review was contracted for in 1994, but that the 1999 contract was for routine maintenance. Simply put, there is no evidence of a nexus between the alleged breach of the contract and the FAA's enforcement action. No reasonable jury could conclude that the breach of the 1999 contract caused the FAA to suspend the airworthiness certificate of N825D, much less that such a result was in the contemplation of the parties when they entered into the contract.

In sum, the court denies summary judgment with respect to the claim for damages in the amount of the repair costs for N825D, but grants summary judgment to Raytheon to the extent that the plaintiffs seek damages for emotional distress, the diminished value of N825D caused by the delay in completing repairs, the loss of use caused by the same delay, and costs in defending the FAA action.

### 14. Breach of insurance contract

■ In Count Fourteen, as set forth in the pretrial order, the plaintiffs allege that National Union breached its insurance contract with the plaintiffs covering N825D. The contract, policy GM3388558–01, was effective on the date of the accident and provided coverage for "physical damage" to N825D. "Physical damage" includes "accidental, direct physical loss of or damage to scheduled aircraft ... but does not include the loss of use or any residual depreciation in value either before or after any repairs have been made." The policy excludes from the definition of "physical damage" any "loss damage, claim or expenses ... which [are] due and confined to wear and tear, deterioration, mechanical or electrical breakdown of the insured property, its equipment, components or accessories." The policy also provides that in the event of a "total loss," National Union will pay to the insured the value of the aircraft. "Total loss" is defined as "any physical damage loss for which the cost to repair when added to the salvage value equals or exceeds" the insured value of the aircraft.

The plaintiffs argue that National Union breached the contract by failing to pay for engine work totaling approximately $9,900 and storage costs totaling approximately $6,000. The plaintiffs also argue that the

contract was breached because National Union did not declare the aircraft a "total loss." National Union argues in its summary judgment motion that the terms of the contract are unambiguous, that the total loss provision does not apply and that the policy does not cover the engine repair or storage costs.[33]

The insured value of N825D was $1,000,000. The salvage value of N825D, calculated near August 2001, according to an expert retained by Joseph Wilen, was approximately $461,000. In their response to Raytheon's summary judgment motion, the plaintiffs assert that the wholesale market value of the aircraft in the fall of 2000 was "approximately $500,000." National Union has paid approximately $148,000 to Raytheon for repairs to N825D. Adding the amount already paid by National Union to repair N825D, the Garrett Aviation proposal to repair the leading edge for $10,760 and have Learjet perform a stall test for $3,700, the amount for engine repairs and storage costs,[34] and the salvage value of N825, the amount does not equal or exceed the insured value of the aircraft, $1,000,000. Mr. Wilen conceded this point in his deposition and the plaintiffs do not submit evidence indicating otherwise. Pursuant to the unambiguous definition of the insurance contract, N825D is not a "total loss."

The plaintiffs argue that because N825D could not be repaired, it was a total loss. The evidence submitted to the court indicates that N825D could be repaired by a Learjet-authorized repair facility. There is no evidence in the record suggesting that Learjet controlled whether other Learjet-authorized repair facilities could repair the leading edge of N825D. The plaintiffs also failed to present evidence indicating that Learjet refused to perform a stall test once the leading edge is repaired by a Learjet-authorized facility and that all Learjet-approved pilots are employed or otherwise controlled by Learjet. Thus, the plaintiffs have not demonstrated that N825D could not be repaired nor have they demonstrated that N825D could not be returned to service following repairs. In addition, the case that plaintiffs rely on for the proposition that the inability to repair N825D means that it was a total loss under the insurance contract, *Bowling v. Gober*, 206 Ga.App. 38, 424 S.E.2d 335, 337 (1992), does not stand for that proposition. Instead, the *Bowling* court simply held that there remained questions of fact that precluded summary judgment based on the allegation that the plaintiff received full satisfaction of his claim. In the course of reaching this decision, the *Bowling* court noted the "general rule" for calculating the amount recoverable for a vehicle "destroyed to the extent that it cannot be repaired economically." [35] Because under the plain language of the insurance contract, N825D was not a "total loss" and because the plaintiffs have not persuaded the court that N825D was unable to be repaired and that the inability to repair N825D means that it was a total loss, summary judgment is granted to National Union with respect to the plaintiffs' claim

**33.** National Union also argues that the Kansas statute permitting attorney fees in insurance contract cases does not apply.

**34.** The court included these amounts without reaching the question of whether they are costs covered by the policy for the purpose of demonstrating that, even with these costs included, the amount does not approach $1,000,000.

**35.** National Union also argues that the cost associated with the delay in repairing N825D should not be included in a calculation of whether N825D is a "total loss." The plaintiffs do not respond and the court agrees that the plain language of the insurance contract does not include such loss in the calculation of a "total loss."

that N825D should have been declared a "total loss."

■ National Union argues that the costs associated with engine repairs are not covered by the policy because "[n]o engine parts sustained physical damage from the runway incident." National Union notes that after disassembling the engine to determine if there was damage from the accident, Hale Aircraft replaced parts because of "wear and tear on the parts" not caused by the accident. The policy covers only "accidental, direct physical loss of or damage" to N825D and excludes "loss, damage, claim or expense ... due and confined to wear and tear, deterioration, mechanical or electrical breakdown" of N825D or its parts. The plaintiffs respond by pointing out that "it was necessary to remove the aircraft engine to determine if there was any physical damage to the engines" following the accident and that "[i]n order to reassemble the engines, certain internal components were required to be replaced."

The only evidence submitted to the court regarding the engine repairs is the affidavit of Robert Hale, owner of Hale Aircraft. Mr. Hale states that "[d]uring the process of reassembly, Hale Aircraft determined that certain parts that were not directly related to the incident did not meet the serviceability requirements of the Federal Air Regulations (FARs) for reinstallation in the engines." Mr. Hale also states that while the parts were not damaged by the incident "the sole reason that they had to be replaced was the fact that the engines had to be disassembled." Mr. Hale also says that he told Carson Brooks of National Union "that certain parts and labor were not related to damage caused by the incident."

Mr. Hale's affidavit does not explain what he means by "the sole reason that they had to be replaced was the fact that the engines had to be disassembled." If he means that the wear and tear would not have been discovered but for the disassembly of the engine, then the repairs are likely not covered by the policy. If he means that the disassembly of the engine somehow necessitates the replacement of parts as a matter of course, then the policy likely covers the repairs. For this reason, summary judgment is not appropriate. Furthermore, the court has not been presented with the break-down of which charges for parts and labor were associated with inspecting the engine for damage and which charges were associated with replacing the parts not related to damage caused by the incident. Without this evidence, the court cannot determine what costs the policy requires National Union to pay.

■ National Union also argues that storage costs for N825D following the accident are not covered by the policy. According to National Union, storage fees are "not incurred as a result of accidental, direct physical loss or damage to the aircraft." The plaintiffs respond by pointing to a provision in the policy that provides that in the event of an accident, the insured agrees to "take all reasonable precautions to protect the aircraft ... after any accident or loss." The provision also states that "[r]easonable expenses incurred in providing such protection will be deemed 'incurred at the Company's request.'"

The court concludes that the contract is ambiguous as to the meaning of a "reasonable expense" and "incurred at the Company's request." The applicable rules of construction provided in OCGA § 13–2–2 do not clarify this ambiguity and, therefore, a jury must then resolve the ambiguity. *Deep Six, Inc. v. Abernathy,* 246 Ga.App. 71, 538 S.E.2d 886, 888 (2000). Thus, whether the storage fees are covered by the policy is a question of fact for a jury and summary judgment is not appropriate.

National Union also argues that Georgia law, not Kansas law, governs the recovery of attorney fees and that the plaintiffs have no basis for claiming prejudgment interest. While the court need not decide these issues for the purposes of summary judgment, the court will resolve them by this order to assist the parties in evaluating their exposure to damages.

■■■ National Union argues that an award of attorney fees is a substantive issue and, under Kansas choice of law rules, the law of Georgia is applicable. The court agrees. This court addressed the issue in *Atchison Casting Corp. v. Dofasco, Inc.*, 1995 WL 655183 (D.Kan. Oct. 24, 1995), and held that for purposes of Kansas choice of law rules, rules relating to whether attorney fees will be awarded are substantive. The plaintiffs do not advance a reason for the court to reconsider its earlier decision and the court believes its earlier decision is correct. The plaintiffs' attempt to distinguish the *Atchison Casting* case on the grounds that the case does not involve an insurance company is unsuccessful. The plaintiffs do not explain why the choice of law analysis would be different because it involves an insurance company. The plaintiffs do not dispute National Union's position that if the rule concerning attorney fees is substantive, that Georgia law applies. The court holds that the rules related to the award of attorney fees are substantive and, therefore, the court will apply Georgia law in determining whether attorney fees will be awarded.

■■■ National Union also argues that the plaintiffs should not be able to recover prejudgment interest. The plaintiffs respond by indicating that their claim

for damages is "premised on Kansas law, K.S.A. 16–201, which provides damages on liquidate [sic] contracts." K.S.A. § 16–201 provides for prejudgment interest on liquidated claims. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 953 P.2d. 1027, 1033 (1998). "A claim becomes liquidated when both the amount due and the date on which such amount is due are fixed and certain or when the same become definitely ascertainable by mathematical computation." *Id.* In a case where the amount of damages is not in dispute and at issue is only whether an insurance policy provides coverage, prejudgment interest under the statute is appropriate. *Id.* In this case the only question before the court is whether the "total loss" provision of the insurance policy is applicable and whether the policy provides coverage for storage costs and engine repair costs. The amount to be paid under the "total loss" provision and the costs of engine repairs and storage are not in dispute. Prejudgment interest under K.S.A. § 16–201, thus, would be appropriate.[36] *See id; Royal College Shop, Inc. v. Northern Ins. of N.Y.*, 895 F.2d 670, 674–75 (10th Cir.1990) (holding that, under Kansas law, prejudgment interest was appropriate in a dispute between insurer and insured over liability under an insurance contract where the amount of damage to a building from a fire was not in dispute).

In sum, the court grants summary judgment to National Union to the extent that Count Fourteen is based on the claim that the insurance contract was breached by National Union's refusal to pay under the "total loss" provision of the contract and denied to the extent that the claim is based upon National Union's refusal to pay for engine repairs and storage costs.[37]

---

**36.** National Union does not raise the issue of whether the Kansas statute is applicable and, thus, the court need not reach the issue.

**37.** National Union challenges the plaintiffs' claim for damages in the amount of costs necessary to return N825D to service for the first time in its reply. Because National Un-

15. Bad faith refusal to pay

The plaintiffs allege in Count Fifteen, as set forth in the pretrial order, that National Union refused to declare N825D a "total loss" and pay for the engine repairs and storage costs after the plaintiffs made a demand for such payment, that National Union's refusal was in bad faith, and that National Union was obligated under the insurance contract to pay the amount demanded but did not do so within 60 days of the plaintiffs' demand.

 Under Georgia law, the plaintiffs have the burden of proving that non-payment was in bad faith. *Rice v. State Farm Fire & Casualty Co.*, 208 Ga.App. 166, 430 S.E.2d 75, 78 (1993). Penalties for bad faith and attorney fees are not authorized where the insurance company has any reasonable ground to contest the claim or where there is a disputed question of fact. *Id.* "As a matter of law, bad faith penalties and attorney fees under O.C.G.A. § 33-4-6 are not awardable if an insurer has a reasonable and probable cause for refusing to pay a claim." *Wallace v. State Farm Fire & Casualty Co.*, 247 Ga.App. 95, 539 S.E.2d 509, 511 (2000). The issue of bad faith of an insurance company is a question of fact for the jury. *Binns v. Metropolitan Atlanta Rapid Transit Authority*, 250 Ga. 847, 301 S.E.2d 877, 878 (1983); *Allstate Ins. v. O'Brien*, 172 Ga. App. 693, 324 S.E.2d 498, 500 (1985).

 To the extent that the plaintiffs are basing Count Fifteen on National Union's refusal to declare N825D a "total loss" under the policy, the court has determined that N825D was not a "total loss" and, therefore, National Union was justified in refusing to declare N825D a "total loss." To the extent that Count Fifteen is based on National Union's refusal to pay for the engine repairs and for storage

costs, the court also grants summary judgment to National Union. In the case of engine repairs, there is a disputed question of fact. National Union alleges that the costs for engine repair were based on parts not damaged by the accident and the plaintiffs allege that the costs were incurred only because of the accident. Because whether the costs are a result of the accident remains a disputed question of fact, a bad faith claim cannot be based on National Union's refusal to pay the costs. *Grange Mutual Casualty Co. v. Law*, 223 Ga.App. 748, 479 S.E.2d 357, 359 (1996) (holding that because a question of fact remained about whether the insured started a home fire, an act that would preclude coverage, a bad faith claim could not be based on the insurance company's refusal to pay). Whether National Union is required to pay for storage costs, as explained above, is a question of fact because of ambiguity in the insurance contract. The provision being ambiguous, National Union had a good faith reason to refuse the plaintiffs' demand and a bad faith claim may not be based on the refusal. Thus, the court grants summary judgment to National Union because a claim of bad faith cannot be premised upon National Union's refusal to declare N825D a total loss, to pay the cost of engine repairs or to pay storage costs.

16. Plaintiffs' partial summary judgment motion

The plaintiffs argue in their motion for partial summary judgment that the evidence is undisputed that N825D meets the requirements of Type Certificate A10CE. The plaintiffs seek an order from the court striking the defendant's privilege defense, precluding evidence and argument indicating that N825D "has at any time since

---

ion does not raise this argument earlier, allowing the plaintiffs an opportunity to re-

spond, the court will not reach the issue in this order.

September 18, 1992 failed to meet the requirements of Type Certificate A10CE," and granting summary judgment on Counts Three and Four.

The court has already rejected Learjet's privilege argument but has granted summary judgment to Learjet on Counts One through Seven. The plaintiffs' motion, therefore, is moot. The court also notes that a review of the evidence indicates that whether N825D is now, or has since 1992, been in compliance with the requirements of Type Certificate A10CE remains in dispute, with substantial evidence indicating that it was not in compliance.[38] The plaintiffs' motion, therefore, is denied.

IT IS THEREFORE ORDERED that summary judgment is granted to Learjet with respect to Counts One through Seven; summary judgment is granted to Raytheon with respect to Counts Ten and Twelve; summary judgment is granted to Raytheon in part with respect to Counts Eleven and Thirteen in that the plaintiffs may only recover damages for the repair of damages to N825D caused by the February 2000 landing accident; summary judgment is granted to National Union, in part, with respect to Counts Fourteen and Fifteen in that the court finds that National Union did not breach the insurance contract by not paying under the "total loss" provision of the policy; summary judgment is granted to National Union with respect to Count Fifteen; and the plaintiffs' partial summary judgment motion is denied.

---

**38.** The FAA order suspending N825D summarizes the majority of this evidence. The settlement agreement does not indicate that N825D is now or ever was in compliance with the requirements of Type Certificate A10CE, only that it is found airworthy upon the completion of certain acts if restricted to flying at 45,000 feet.